**Kenneth Ray RANSOM, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 69339.**

Court of Criminal Appeals of Texas, En Banc.

June 14, 1989.

Rehearing Overruled Sept. 20, 1989.

Certiorari Denied June 25, 1990.

See 110 S.Ct. 3255.

Janet Morrow, Catherine Burnett, of counsel on appeal, and Wesley H. Hocker, court appointed on appeal, Houston, for appellant.

John B. Holmes, Jr., Dist. Atty., Kathlyn Giannaula, Brian Rains, Asst. Dist. Attys., Houston, and Robert Huttash, State's Atty., Austin, for the State.

## OPINION

McCORMICK, Presiding Judge.

Appellant, Kenneth Ray Ransom, appeals from his conviction for capital murder where the death penalty was assessed as punishment. On appeal to this Court, appellant raises fourteen points of error. Finding all points of error to be without merit, we accordingly affirm the conviction.

### The Sufficiency of Evidence

Appellant claims that the evidence is insufficient to sustain the jury's determination of guilt. Reviewing the evidence in the light most favorable to the verdict, the record reflects the following:

Appellant was with his girl friend, Wanda Phillips, at her home for most of the day on June 30, 1983. After seven o'clock p.m., James Randle, a friend of appellant, came to Phillip's home to talk with him. Appellant and Randle went outside—away from Wanda and her small daughter. The two

talked for about fifteen minutes. Randle left and appellant came back into the home. Later, Randle returned to the home for a second time. The two went outside again to talk for about fifteen minutes. Randle left, but between nine thirty and nine forty-five p.m., he returned to the home and for a third time he and appellant went outside to talk. Both men went into the kitchen after this third discussion. While there, they removed a butcher knife from the dish drainer. Randle told appellant, "Oh man, here's one that we can use." As they started to leave with the knife, Phillips asked appellant where he was going and said that she needed her knife. Appellant responded that they were going to pick up Randle's cousin's paycheck. Randle told her, "Hold on you're going to get your knife back. We'll bring that knife back."

Between nine thirty and ten o'clock p.m. that night, Randle's mother saw Randle with Richard James Wilkerson, Randle's cousin, and "another boy" at her home. Randle's younger brother, Jessie, saw appellant leave with Randle and Wilkerson at some time before midnight. Earlier that day, Randle's mother had borrowed a butcher knife from one of her neighbors but was later unable to find it.

At approximately ten o'clock that night, Wilkerson's sister saw appellant standing outside her home when she unlocked the screendoor to let her brother inside. Wilkerson went into the kitchen and rummaged through the drawer where the family kept the butcher knives. Randle waited in the kitchen doorway. After going through the drawer, Wilkerson went into the bedroom with Randle. The two went outside five or ten minutes after they had arrived at the home. When Wilkerson's sister locked the door behind them she saw appellant speaking with Wilkerson and Randle. The three left together.

Anil Varughese, Rod Harris, Arnold Pequeno and his younger brother, Joerene Pequeno, were employees of the Malibu Grand Prix Race Center in Houston. The race center, which contained numerous video games inside the center and had a racetrack for gocarts outside, was open for business from ten o'clock a.m. until midnight. Richard James Wilkerson had also been employed by the race center but his employment was terminated on June 20, 1983. Wilkerson could not pick up his last paycheck until June 30, 1983—the day that appellant told Phillips that he was going to pick up Randle's cousin's paycheck. Before Wilkerson could get the check he had to appear in person at the race center and sign his time card indicating that he had received it. As of two-thirty p.m., on June 30, 1983, Wilkerson had not picked up his check.

Late that night, at three o'clock a.m. on July 1, 1983, appellant with Randle and Wilkerson returned to Phillips' home. Wilkerson was carrying a black satchel. Appellant went into the bathroom and the other two men went into the bedroom. All three men had blood on their clothing. Appellant, while in the bathroom, tended to a severe cut on the inside of his right hand.

Inside the bedroom, Wilkerson poured the contents of the black satchel—currency, a wallet, a calculator and a watch—onto the bed. Some of the money was bloody. The three men counted it together after which Randle gave appellant a share. Phillips estimated appellant's share to be around three hundred and twenty-five dollars. Appellant counted the money, put it into his pocket and began watching television with the two other men. Wilkerson and Randle talked of how they had "slashed" somebody's throat and "put the knife in someone['s] temple." Phillips, while the men watched television, began cleaning her kitchen. She discovered that a billfold, some credit cards and a driver's license had been discarded in the garbage. The driver's license had the name "Roddy Harris" on it. Randle took the billfold, the credit cards and the license away from Phillips and threw them into the dumpster.

When Phillips asked appellant from where the money had come, he replied, "We just went and got some money." Phillips and appellant, that next day, used the money to purchase clothing for themselves.

Early that morning, at around eight o'clock a.m., the bodies of Anil Varughese,

Rod Harris, Joerene Pequeno and Arnold Pequeno were discovered at the race center by a friend of Varughese. Anil Varughese's body was discovered in the manager's office. He had been stabbed at least eight times—five times in the chest and three times in the abdomen. He was eighteen at the time of his death.

The other three bodies were found in one of the race center's bathrooms. Rod Harris' body was found in one of the stalls. He had been stabbed at least seven times in the chest. Joerene Pequeno's body was found in the other stall. He had been stabbed eleven times—once in the chest, once in the neck, once in the back, and once in the right hand; he had been stabbed seven times in the neck area with one cut severing his jugular vein. Arnold Pequeno's body was in a bathroom corner with his head under one of the urinals. He had been stabbed and cut twenty-two times in the neck, chest, abdomen, back and right hand. One of the cuts to his neck severed his jugular vein. Arnold's watch and class ring were missing along with a black satchel in which he carried his school books. At the time of their deaths, Rod Harris was twenty-two years old, Arnold Pequeno was nineteen and his younger brother, Joerene, was eighteen.

The three victims' blood covered the bathroom floor and was splattered on the walls and ceiling. There was blood not matching that of the victims on the sink's counter, on a paper towel and on the bathroom door. A trail of blood led out of the bathroom, through the race center and into the parking lot area. Analysis revealed that this blood could not have come from any of the victims or from either Randle or Wilkerson. Only appellant's blood was genetically compatible to it.

The fingerprint to appellant's left index finger was lifted from the door to the bathroom stall where Harris' body was found. The print was discovered on the inside of the door at the top. Randle's fingerprint was lifted from the inside of the door to the bathroom stall where Joerene Pequeno's body was found.

Over thirteen hundred dollars was missing from the race center's safe and petty cash drawers. Wilkerson's last paycheck was also missing. His time card had been signed and was found laying on the manager's desk.

The knife that was taken from Phillips' home was discovered in an area near the racetrack. The knife was broken into two pieces.

Late that evening on the day that the bodies were discovered, appellant was with Phillips. The two were watching television. A news story about the murders was broadcast. Upon seeing the story, appellant was visibly upset. At around seven o'clock that evening, appellant told Phillips that he was going to Wharton, Texas. The last time Phillips saw appellant, he was wearing a high school class ring and a watch both of which were identical to the ones that Arnold Pequeno had been wearing before his murder. Phillips had never seen appellant wear the ring or the watch before that day. Also, the calculator that was in the satchel along with the satchel itself were identified at trial as belonging to Arnold Pequeno.

Appellant, before this Court, insists that the above is insufficient to support a jury's determination of guilt beyond a reasonable doubt. Relying upon *Garrett v. State*, 682 S.W.2d 301 (Tex.Cr.App.1984) *cert. denied*, 471 U.S. 1009, 105 S.Ct. 1876, 85 L.Ed.2d 168 (1985), he asserts that the evidence supports a reasonable hypothesis that he did not know in advance that any robbery or killing was contemplated, did not agree to commit the offense and did not participate in it. Appellant directs our attention to that part of the record where he testified that he did not know Randle and Wilkerson went to the race center planning to rob and murder the four young men. He also directs us to that part of the record where Phillips testified that Wilkerson and Randle told her that appellant had no part in the killings and that he merely played video games while they committed all four murders. He insists that these portions support a reasonable hypothesis of his innocence inconsistent with guilt and that

therefore his conviction for capital murder can not stand.

The standard of review for sufficiency of the evidence on appeal is the same for direct and circumstantial evidence cases, and that is to view the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Garrett*, 682 S.W.2d at 304; *Brandley v. State*, 691 S.W.2d 699, 703 (Tex.Cr.App.1985). This is the standard of review enunciated by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979):

> "[T]he critical inquiry in review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. But this inquiry does not require a court to 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.' *Woodby v. INS*, 385 U.S. [276] at 282 [87 S.Ct. 483, 486, 17 L.Ed.2d 362 (1966)] (emphasis added). Instead, the relevant question is whether, after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." 443 U.S. at 318–319, 99 S.Ct. at 2788–2789 (footnote and citations omitted, emphasis in the original).

In *Garrett*, we stated that "in applying the above standard of review the 'exclusion of reasonable hypothesis' test may be used as a means of analyzing the sufficiency of circumstantial evidence cases." 682 S.W.2d at 304. See also *Wilson v. State*, 654 S.W.2d 465 (Tex.Cr.App.1983); *Denby v. State*, 654 S.W.2d 457 (Tex.Cr.App.1983); *Freeman v. State*, 654 S.W.2d 450 (Tex.Cr.App.1983); *Carlsen v. State*, 654 S.W.2d 444 (Tex.Cr.App.1983) (opinions on rehearing).

■ In a circumstantial evidence case the State is not required to prove to a moral certainty that the circumstances presented actually exclude every hypothesis that the criminal act may have been committed by another person; it must only exclude every reasonable hypothesis raised by the evidence that would tend to exculpate the accused. Therefore, to satisfy the exclusion of reasonable hypothesis test "it is enough that the conclusion of guilt is warranted by the combined and cumulative force of all the evidence." *Brandley*, 691 S.W.2d at 703.

■ Applying the *Jackson* criteria we find that a rational trier of fact could have found beyond a reasonable doubt that appellant committed the offense with which he was charged.[1] Among the facts the jury could have reasonably considered to determine that appellant was an active participant in the murders are: (1) on the day of the murders, appellant was seen in the company of the two men whom he admitted at trial were responsible for the killings; (2) before the killings, appellant and the other two men had surreptitious meetings—talking out of hearing distance from those that may have been close by; (3) the three men went from home to home in search of knives and Phillips overheard Randle tell appellant, "Here's one we could use"; (4) Randle, with appellant, told Phillips as they left the house that she would get her knife back and appellant told her that they were going to pick up Wilkerson's paycheck; (5) Phillips' knife was found near the scene of the murders, broken into two pieces; (6) appellant's fingerprint was found on the door to the bathroom stall where one of the mutilated bodies was found; (7) blood genetically compatible to that of appellant's was found in the bathroom where the three bodies were found and the blood could not have been that of any of the victims or of the two

---

1. The indictment, in pertinent part, alleged that appellant "while in the course of committing and attempting to commit the robbery of ARNOLD PEQUENO, hereafter styled the Com-plaint, intentionally cause[d] the death of the Complainant by stabbing and cutting the Complainant with a knife...."

co-actors; (8) when appellant returned to Phillips' home that night he told her that, "We just went and got some money"; (9) appellant's right hand had been cut and blood covered his clothing; (10) appellant took a share of the money, spending it on clothing for himself; (11) after seeing a televised account of the murders, appellant was visibly upset, later he left Houston; and, (12) appellant was last seen wearing one of the victim's watch and high school class ring. Clearly, the evidence is sufficient under the *Jackson* standard.

Applying the *Garrett* test, we find that a reasonable jury could have rejected appellant's version of the facts. Appellant had testified that while Wilkerson murdered Varughese in the manager's office, Randle, a sixteen year-old, murdered all three of the victims in the bathroom. Appellant, therefore, wanted the jury to believe that one teenager, acting alone, could overcome three other young men, killing each with several knife wounds and cutting the jugular veins of two of the victims. The unreasonableness of this hypothesis is exacerbated by the combined and cumulative force of all the other incriminating circumstances listed above.

The totality of the evidence supports the jury's determination of guilt. The jury was reasonable in finding that appellant was an active participant in the murders. Appellant's thirteenth point of error is overruled.

■ In his fourteenth point of error, appellant complains that the evidence is insufficient to support the jury's determination that he acted deliberately in the killings. We disagree.

Pursuant to Article 37.071(b)(1), V.A.C.C.P., the jury was asked to determine "whether the conduct of [appellant] that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result." The jury answered in the affirmative and that answer is supported by the record.

Appellant secured a murder weapon, traveled across Houston and, as the jury found, was an active participant in the murders of four young men. "To find the act of deliberateness, there must be the moment of deliberation and determination on the part of the actor to kill." *Cannon v. State,* 691 S.W.2d 664, 677 (Tex.Cr.App. 1985) cert. denied, 474 U.S. 1110, 106 S.Ct. 897, 88 L.Ed.2d 931 (1986). The repeated stabbings of the victims evidence a deliberate act with a more than reasonable expectation that death would result. See *Fearance v. State,* 620 S.W.2d 577, 584 (Tex.Cr. App.1980) (opinion on rehearing) cert. denied, 454 U.S. 899, 102 S.Ct. 400, 70 L.Ed.2d 215 (1981); *Granviel v. State,* 552 S.W.2d 107, 123 (Tex.Cr.App.1976) cert. denied, 431 U.S. 933, 97 S.Ct. 2642, 53 L.Ed.2d 250 (1977). Securing the weapon, the surreptitious meetings between appellant and the two other men and traveling across Houston to get to the race center is evidence of both deliberation and determination on the part of appellant. See *Ex parte Alexander,* 608 S.W.2d 928, 931 (Tex. Cr.App.1980). Appellant's fourteenth point of error is rejected.

### The Change of Venue

In his ninth point of error, appellant claims that the trial court should have granted his motion for change of venue due to the pretrial publicity surrounding this case. See Article 31.03, V.A.C.C.P.

■ The test to be applied in determining whether a motion to change venue should be granted by the trial court is whether outside influences affecting the community climate of opinion as to a defendant are inherently suspect. *Beets v. State,* 767 S.W.2d 711, 742 (Tex.Cr.App. 1988); *Phillips v. State,* 701 S.W.2d 875, 879 (Tex.Cr.App.1985) cert. denied, 477 U.S. 909, 106 S.Ct. 3285, 91 L.Ed.2d 574 (1986). The defendant seeking a change of venue "bears a heavy burden to prove the existence of such prejudice in the community that the likelihood of obtaining a fair and impartial jury is doubtful." *Nethery v. State,* 692 S.W.2d 686, 694 (Tex.Cr.App. 1985) cert. denied, 474 U.S. 1110, 106 S.Ct. 897, 88 L.Ed.2d 931 (1986). Ordinarily, a defendant seeking a change of venue must demonstrate an actual, identifiable preju-

dice attributable to pretrial publicity on the part of the community from which will come the members of the jury. See *Beets* 767 S.W.2d at 743; *Faulder v. State,* 745 S.W.2d 327, 338 (Tex.Cr.App.1987).

■ Merely because a particular case is publicized in the media does not give rise to a prima facie case of prejudice so that a defendant is entitled to a change of venue—jurors do not have to be totally ignorant of the facts and issues of a particular case. *Murphy v. Florida,* 421 U.S. 794, 801, 95 S.Ct. 2031, 2037, 44 L.Ed.2d 589 (1975); *Eckert v. State,* 623 S.W.2d 359, 363 (Tex.Cr.App.1981). Rather, for a defendant to prevail in his motion for change of venue, he or she must demonstrate the publicity about the case is pervasive, prejudicial and inflammatory. *Phillips,* 701 S.W.2d at 879. See also *Eckert,* 623 S.W.2d at 363–364; *McManus v. State,* 591 S.W.2d 505, 517–518 (Tex.Cr.App.1979); *Freeman v. State,* 556 S.W.2d 287, 296–298 (Tex.Cr.App.) cert. denied, 434 U.S. 1088, 98 S.Ct. 1284, 55 L.Ed.2d 794 (1978).

■ On appeal, the standard of review for this Court is whether the trial court abused its discretion in refusing to grant the motion for a change of venue. "Absent a showing by the defendant that there exists such prejudice in the community that the likelihood of obtaining a fair trial by an impartial jury is doubtful ... the discretion of the trial court to deny such a motion will not be disturbed on appeal." *Beets,* 767 S.W.2d at 742.

■ Appellant in his brief insists that the news coverage of the murders, contained on videotapes that were introduced into evidence at the hearing to change venue, "was substantial and went beyond that designed for informing the public of current events." He states that the "coverage given to the funerals of the two brothers

on television in which cameras were focused on sobbing people in the church during the service itself, [was] quite dramatic." He also points out that the other two victims were reported as being fine people. He concludes that these news stories along with the other accounts that described the murders as being "horrible," a "massacre," a "slaughter house," "unexplained brutality" and the "most brutal mass murder in Houston in recent years," were sufficient to show that the trial court abused its discretion when it failed to grant his motion for a change of venue. While we agree that the news coverage of the murders was extensive, we can not agree with appellant that the record before us demonstrates that the trial court abused its discretion in refusing to grant a change of venue.

In the case before us the trial court, at the hearing on appellant's motion to change venue, heard testimony that there was no more news coverage on this case than on any other capital murder case where a number of people have been killed. The judge also heard testimony that the news coverage lasted for only about seven weeks after the murders. There was also testimony that in the trial of the co-actor, Wilkerson, only three of seventy-five to eighty-five jurors were excused due to pretrial publicity. A criminal defense attorney who practices in Houston, called by appellant to testify at the hearing, thought that appellant would be able to get a fair trial in that community.[2] The news coverage[3] of which appellant complains occurred immediately after the murders. Jury selection of this case did not take place until nine months after this coverage. Such delay tends to negate inferences that substantial publicity would affect the community's climate of opinion. *Nethery,* 692 S.W.2d at 694–695; *Adami v. State,* 524 S.W.2d 693,

---

**2.** The attorney qualified his remarks, however, by stating that it might take two to three times the normal amount to select a jury.

**3.** At the hearing to change venue, appellant introduced videotaped news coverage concerning the murders taken from two Houston television stations. The factual accounts reported in the news coverage are consistent with the testimony

given at trial. Appellant is incorrect when he states in his brief that the media gave false accounts indicating that he had confessed to the murders. The account to which appellant refers indicates that appellant was at large when Wilkerson told the media that they had murdered the victims by separating them from each other so as to make it easier to kill them.

704 (Tex.Cr.App.1975). Also, each of the jurors selected for this case had indicated in voir dire that their verdict would not be affected by the pretrial publicity. The testimony given at the hearing to change venue, along with the time interval between the news stories and the trial of appellant, support the trial court's finding that appellant could obtain a fair trial in Harris County. We hold that the trial court did not abuse its discretion when it denied appellant's motion to change venue; accordingly, appellant's point of error number nine is overruled.

In his eighth point of error, appellant asserts that the trial court erred in granting the State's motion to quash a subpoena duces tecum and that such actions effectively denied him his right to compulsory process.

Appellant subpoenaed a scrapbook that the Harris County District Attorney maintained. Appellant wanted to introduce the book into evidence at the hearing on his motion for change of venue. The trial court purported to quash the subpoena. In the hearing, however, the trial court examined the book. He did not allow its admission into evidence at the hearing but did so as a bill of exception. Thus, it is obvious to us that although the trial court ordered the subpoena duces tecum to be quashed, that order was subsequently nullified when the book was allowed into evidence as a bill of exception. Consequently, appellant has not been denied his right to compulsory process. His eighth point of error is overruled.

### The Voir Dire

In his tenth point of error, appellant argues that the trial court improperly granted the State's challenge for cause to one of the members of the venire, insisting that she was qualified under *Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980), to serve as a juror. Under this same point of error, he argues that the trial court judge should have allowed more questioning of the prospective juror before he granted the State's challenge for cause.

As to appellant's *Adams* argument, we find that the trial court properly granted the State's challenge for cause. The venireman was first examined by the trial court judge who explained the difference between murder and capital murder. He explained that in a capital murder case the only penalty capable of being assessed was either life imprisonment or death. The venireman responded by saying that, "I really don't believe in giving death." The trial court further inquired:

"All right ... that's probably the position that a lot of people have but at the same time there are people who don't believe in it and could never be a party to writing a verdict that would result in the death of another individual. But there are others people who don't believe in it but since it is the law could in a proper case join with eleven other people and write a verdict that would result in the death of a defendant. Where are you in that category? How do you feel there?"

To this, the venireman responded: "I really wouldn't be a part of that. I realize I should but I just in all human I just cannot be responsible for somebody's death." The trial court asked, "Now you don't like death, the penalty of death for a criminal offense, is that so strong that you could never write a death penalty of another person?" The venireman responded, "I'm afraid so." The following colloquy occurred:

"Q. [BY THE COURT]: Would it violate your conscience to be a party to a twelve person jury where you had to write a death penalty?

"A. I really wouldn't want to be a part of it but if I had to I would have to accept it but I really wouldn't want to be a part of it.

"Q. How strong do you not want to be? That's what I need to know.

"A. Very strong but if I was picked I would have to go along with it. But it's against my conscience.

"Q. If you were selected as a juror in this case you would be asked to take an oath to follow the law and if the evidence that was introduced here con-

vinced you beyond a reasonable doubt that the defendant was guilty could you join with other jurors in writing a verdict of guilty?

"A. I guess, I would have to. I really wouldn't want to but I probably would have to.

"Q. If having found a defendant guilty you got additional testimony that would result in your finding that the answer to those two questions should be 'yes' when you knew that by answering 'yes' that it would result in the death of the defendant you know that you can answer one of them 'no' and if you answer one of them 'no' he wouldn't get the death penalty. He would get life. Would you be inclined, would you answer this truthfully one of them 'no' just to protect and see that the Defendant didn't get death?

"A. I probably would.

"Q. You think that you probably would. Well, you kind of conflict or you give me some problem of concern. You say if I was on the jury and if I had to write a verdict that would result in the death of a defendant I could then on the other hand you say, well if I had the choice of answering the two questions I probably would fabricate one of them and there's nothing wrong in this and I mean that sounds horrible when you use the word fabricate, dishonest, untruthful but we have a right to know and it's something that you have to live with the rest of your life. Talk to me about it. How strong do you feel against the death penalty?

"A. Very strongly. I'm afraid I have to live with that. I prefer life rather than death.... Even though he took someone else's life I still would prefer life rather than death.

"Q. Yes. But if you were selected as a juror and you heard the evidence— you understand if the State proves a defendant's guilt beyond a reasonable doubt you've taken an oath to follow the law and to find him guilty.

"A. I don't know how to answer that....

"Q. Well, you answered it two or three different ways for me. I want to know exactly how you feel. As I told you some people think that the death penalty is a proper penalty and they have no problem with it. Other people don't think it's a proper penalty but if it is the law they can follow it. Many other people don't think it'd (sic) a proper penalty and they are so strong in their belief that they could not follow the law. Now where do you fit in those categories?

"A. Like I said before I don't believe in death. I would rather life but if I was on a panel with a bunch of them I might be inclined to go along with them. I still don't believe in death rather life."

The State's attorney was then allowed to examine the perspective juror. He asked, "I guess what I'm asking you to do is asking you if you would violate the law intentionally and intentionally answer one of those questions 'no' so that the person would get life rather than the death but at the same time you're able to live with your conscience? Would you do that?" The venireman answered, "Yes.... Like I said before, I don't believe in death so maybe I have to violate the law and say life instead of death." After this exchange the following took place:

"Q. [BY STATE'S ATTORNEY]: Okay, well, you've used the word maybe.

"A. I would.

"Q. The problem comes sometimes where we as lawyers are allowed to give examples in regards to capital murder situation. Where we can ask you to envision a set of facts or a set of circumstances whereby the offense itself is a terrible offense. Where numbers of people are killed, where the individual has taken the witness stand and had confessed and where he says that I will do it again. Now there would be no question in many peoples minds that person is a danger to society but at the same time they also know and you know now that no matter how bad that individual is that if you answer those two issues 'yes' he would receive death and that would then be on your conscience. So that I guess what I'm in effect asking you to do,

could you ever see yourself in any circumstance being able to answer those two issues 'yes' knowing that somebody would receive death knowing that you violated your conscience?

"A. No.

\* \* \* \* \* \*

"Q. Before I quit asking you questions I just want to make sure that you're sure in your own mind so that when you are asked to envision this horrible set of facts and horrible set of circumstances that may involve a number of people being killed ... and set of facts where this individual is just no hope of rehabilitation at all that you're not going to change you mind and say well, maybe in that case I could say yes. Are you sure in your mind that you would always answer one of them 'no'?

"A. I'm pretty sure.

"Q. You say I'm pretty sure now?

"A. I'm sure."

The venireman, a nurse, was then examined by the defense attorney who, after presenting a particular set of facts where an individual set fire to the maternity ward of a hospital and said he would kill again, asked the venireman if she could be truthful in her answers and follow the law. She said, "I guess so.... [i]f that's the way I have to go."

The trial court resumed examination asking, "And [if] you were in that trial and the other jurors all eleven of the other jurors wanted to write a penalty of death could you join the other jurors and write a penalty of death." Unequivocally, the prospective juror answered, "No. I'd rather life." She further said, "I would," when asked if she would falsify and answer one of the special issue questions "no" so that appellant would receive a life sentence. Thereafter, the State challenged the venireman for cause and the trial court sustained the challenge.

■ In the trial court, the proper standard to be used in disqualifying prospective jurors in death penalty cases is whether their views would prevent or substantially impair the performance of their duties as jurors in accordance with the instructions given and the oaths taken. *Bell v. State*, 724 S.W.2d 780, 794 (Tex.Cr.App.1986) cert. denied, 479 U.S. 1046, 107 S.Ct. 910, 93 L.Ed.2d 860 (1987); *Sharp v. State*, 707 S.W.2d 611, 620 (Tex.Cr.App.1986). "[T]his standard ... does not require a juror's bias [or prejudice] be proved with 'unmistakable clarity.'" *Ellis v. State*, 726 S.W.2d 39, 43 (Tex.Cr.App.1986), quoting *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). On appeal, we recognize that great deference must be given to the trial court judge who is in the best position to see and hear the prospective jurors and to evaluate their responses. As such, we will reverse a trial court's ruling on this issue only when the record shows a clear abuse of discretion on the trial court's part.

■ No such abuse is demonstrated in the record before us. The prospective juror changed her answers throughout her examination—she vacillated between being able to follow her oath as a juror and voting "no" on one of the special issues so as to prevent imposition of the death penalty. We find it significant that the last question asked of the venireman was whether she would change her answer to one of the special issues to which she answered in the affirmative. Under such circumstances the trial court is in the best position to evaluate the venireman's answers and to rule accordingly. As stated in *Witt:*

"[A] trial judge's finding that a particular venireman was not biased and therefore properly seated was a finding of fact subject to [28 U.S.C.] § 2254(d). We noted that the question whether a venireman is biased has traditionally been determined through voir dire culminating in a finding by the trial judge concerning the veniremen's state of mind. We also noted that such a finding is based upon a determination of demeanor and credibility that are peculiarly within the trial judge's province. Such determinations are entitled to deference even on direct review." 469 U.S. at 428, 105 S.Ct. at 854 (footnote omitted).

The trial judge found the venireman un-qualified to sit as a juror. The record supports the trial court's finding and, as such, we hold that the trial court did not abuse its discretion when it sustained the State's challenge for cause.

 Appellant also argues under this point of error that the trial court judge should have more thoroughly questioned the venireman. He insists that "[r]eversible error occurred in the instant case because the trial judge granted the challenge too quickly," and that "[b]y terminating the education process of the juror where he did, the trial court judge cannot be said to have formed a definite impression" of the venireman's ability to sit as a juror. We note that at no time did appellant advance this argument in the trial court—he did not ask to reexamine the prospective juror after the trial court did so and his initial examination was in no way cut short by the trial court judge. As such, appellant has failed to preserve error, if any, for our review. Tex.R.App.P. 52(a). See also *Witt*, 469 U.S. at 430–431, 105 S.Ct. at 855–856 (Supreme Court finding noteworthy that the trial court judge was given no indication that elaboration was necessary before he excused a venireman). Appellant's tenth point of error is overruled.

 Appellant's point of error number eleven appears to contest the trial court's sustaining the State's challenge for cause to a prospective juror.[4] Appellant admits in his brief, however, that "the last position taken by the prospective juror was that he could not serve and live up to the oath." Nevertheless, appellant asserts that the State's challenge for cause was "suspect" because the venireman was, as appellant puts it, "so intimidated and brow-beaten during the several hours of his examination that he finally gave the answer expected of him." Appellant concludes that we, as a reviewing court, could never be sure of the venireman's ultimate answer and, as such, asks that we overturn his conviction "based on principles of fairness and due process."

After an extensive examination of the prospective juror by both the State and the defense, the trial court judge took over the questioning. The following colloquy took place:

"Q. [BY THE COURT]: Mr. Pravo ... let me tell you something to be sure that you're understanding, will you. I have observed you for the last several hours and I gather you've wrinkled your brow and shook your head and some questions you have unanswered by giving the nod of your head. You've been very reluctant and slow in giving the answers. I get the impression that you've answered sometimes without truly understanding the question. I don't care. You and I talked yesterday. You and I talked earlier today. See I don't represent the State. I don't represent the defendant. I'm merely sitting here to try and help you, if I can, to determine in your mind if you were a juror in this case you could be fair and impartial to both the State and the defendant.

\* \* \* \* \* \*

"You got it now. The ball is in your court. You're going to have to tell me under any circumstances could you join together with eleven other people and write a verdict that would result in the death of an individual?

"A. I don't believe in killing nobody. I don't want to take nobody's life.

"Q. What did I ask you?

"A. You ask[ed] me could I be able to sentence in between eleven people and write the verdict death?

"Q. That's right and what is your answer?

"A. No, sir.

\* \* \* \* \* \*

"Q. And you could never do it?

"A. No, sir.

\* \* \* \* \* \*

4. Appellant's heading to this point of error reads: "The trial court erred in granting the State's challenge for cause to venireman Provo in that the juror was qualified under *Adams v. Texas*."

"Q. You understand that you told [the State's attorney] this same thing a minute ago?

"A. Yes, sir.

"Q. Then when [the defense attorney] talked to you understand that you told him that you could?

 * * * * * *

"A. Well, I was just confused on each. What he was saying the way he was saying it and then he stated the way he stated about the plane.[5] I don't know I just said yes I could you know for what this other guy did on the plane but I mean I don't know. I don't believe I could. [Footnote added.]

"Q. How did he confuse you.

"A. Well, both of them I mean it was a horrible thing that this guy did the way he did it and I just thought that I could give it a thought that I could, you know.

 * * * * * *

"Q. Now that you you've had time to think about it, could you do it?

"A. I don't believe.

"Q. Sir?

"A. No, sir.

"Q. Any doubt in your mind?

"A. No, no doubt in my mind. No doubt.

"THE COURT: Okay. I'm going to excuse him for cause."

Initially we hold, as appellant apparently concedes, the record fails to demonstrate that the trial judge abused his discretion in sustaining the State's challenge for cause. *Wainwright v. Witt,* 469 U.S. at 430–432, 105 S.Ct. at 855–856. In as much as appellant attempts to raise the suspect nature of the State's challenge to this venireman for the first time on appeal, we hold that he has waived any such complaint by not raising it in the trial court. Tex.R.App.P. 52(a). See *Phillips v. State,* 701 S.W.2d 875, 881 (Tex.Cr.App.1985). Appellant's point of error number eleven is overruled.

### The Guilt/Innocence Phase of Trial

Appellant told the jury that he played video games while Wilkerson murdered the manager in his office and Randle killed the three men in the bathroom. On cross-examination, the prosecutor asked appellant why he had "waited until almost a year later to tell these fine twelve people what that story was." Appellant was also asked why, when he had the opportunity, he did not "tell the police."

■ Appellant, in his first point of error, asserts that the prosecutor was impermissibly allowed by the trial court to use appellant's post-arrest silence against him. He relies upon *Sanchez v. State,* 707 S.W.2d 575 (Tex.Cr.App.1986) (plurality opinion).

Appellant's only objection to the prosecutor's questioning was, "He's now striking at the Defendant over the advice given by his counsel."[6] No objection was urged in

---

5. The defense attorney had presented a hypothetical situation to the venireman where a defendant, after he takes out a large insurance policy on his family, blows up a plane on which the family is traveling.

6. The record reflects the following cross-examination by the prosecutor with appellant's objections thereto:

"Q. Well let me ask you Mr. Ransom, why didn't you tell this story to the police back on July the 1st of 1983?

"[DEFENSE ATTORNEY]: I object to that, Your Honor.

"THE COURT: Be overruled.

"A. I was advised by my attorney ... at the time not to give out any written statements or oral.

"Q. Well, this was on July the 5th now that you turned yourself into the police?

"A. Yes.

"Q. And you and your attorney and your mother and step-father came to the police station?

"A. Yes, sir.

"Q. And you didn't say a word did you?

"A. No.

"[DEFENSE ATTORNEY]: I object to that. He's now striking at the Defendant over the advice given to him by his counsel.

"THE COURT: Be overruled.

 * * * * * *

"Q. [Y]ou waited until almost a year later to tell these fine twelve people what that story was.

"[DEFENSE ATTORNEY]: I object again, Your Honor. He's striking at this Defendant over the advice that this lawyer gave to him which is sound legal advice."

the trial court on the ground now alleged on appeal. Nothing is before us for review. Tex.R.App.P. 52(a). See *Nethery v. State*, 692 S.W.2d 686, 710 (Tex.Cr.App. 1985) cert. denied, 474 U.S. 1110, 106 S.Ct. 897, 88 L.Ed.2d 931 (1986); *Smith v. State*, 683 S.W.2d 393, 407 (Tex.Cr.App.1984).

Appellant, in his second point of error, argues that the prosecutor's questioning acted to also deprive him of due process of law. He contends that use of appellant's silence after being told by his attorney that such silence would not be used against him was fundamentally unfair. This objection was not lodged in the trial court and, as such, nothing is before us for review. Tex. R.App.P. 52(a). See *Nethery*, 692 S.W.2d at 710. Therefore, appellant's first and second points of error are rejected.

■ As mentioned above, appellant took the stand and denied conspiring with Randle and Wilkerson to rob and kill the race center employees. On cross-examination, the prosecutor asked, "Would it surprise you to know that they [Wilkerson and Randle] don't agree with your version." Appellant's attorney objected, stating, "I object to that." The trial court sustained the objection, instructed the jury to disregard the question and denied appellant's motion to declare a mistrial. Appellant in his third point of error asserts that the trial court erred in refusing to grant him a mistrial; he relies upon *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

In *Bruton*, the Supreme Court held that at a joint trial of a defendant and his co-defendant, any statement made by the co-defendant implicating the defendant could not be used by the government against the defendant when the co-defendant does not testify at trial and is therefore not subject to cross-examination. Such use was said to deny the defendant his Sixth Amendment right to confrontation. Appellant argues that because Wilkerson and Randle were tried apart from him, the prosecutor's question "implicitly contradicted every exculpatory word that had been uttered from the witness stand ... [and] was such that it could not be refuted by the defense."

Assuming without deciding that appellant's general objection was sufficient to preserve the issue for our review, we hold that the trial court's instruction to disregard was sufficient to cure any error.

Generally, any error in asking an improper question is cured or rendered harmless by an instruction to disregard. *Guzmon v. State*, 697 S.W.2d 404, 408 (Tex.Cr.App. 1985) cert. denied, 475 U.S. 1090, 106 S.Ct. 1479, 89 L.Ed.2d 734 (1986). This Court rarely reverses a conviction due to an improper question being asked by the prosecutor. *Gonzales v. State*, 685 S.W.2d 47, 49 (Tex.Cr.App.) cert. denied, 472 U.S. 1009, 105 S.Ct. 2704, 86 L.Ed.2d 720 (1985). "To cause reversal the question must be obviously harmful to the defendant." Id., citing *Pearce v. State*, 513 S.W.2d 539, 543 (Tex.Cr.App.1974). See also *Boyde v. State*, 513 S.W.2d 588 (Tex.Cr.App.1974). Here, appellant's specific complaint is that the prosecutor's unanswered question acted to deprive him of his constitutional right to cross-examination. We disagree.

In *Griffin v. State*, 486 S.W.2d 948 (Tex. Cr.App.1972), the defendant was jointly tried with his co-defendant. The co-defendant's confession was introduced into evidence with those portions implicating defendant excised. The police officer who took the confession testified at trial. On cross-examination, the co-defendant's counsel attempted to discredit the officer's testimony by implying that the officer had made a deal with the co-defendant so as to procure the confession. On redirect examination, the prosecutor, to substantiate the officer's earlier testimony, read testimony from the co-defendant taken at an examining trial that not only implicated the co-defendant but the defendant as well. In that case we held:

"Immediately this appellant's counsel objected and just as promptly the Court instructed the jury to 'disregard the reading a moment ago from ... [the examining trial testimony that] he had in his hand.' Nothing further was said concerning the examining trial testimony. We find these instructions distinguishable from those condemned in *Bruton*,

supra, where the Court held that an instruction to the jury, to disregard that portion of a confession which referred to a co-defendant, was insufficient to remove the harm that it might cause the co-defendant.... The references to [the co-defendant's] confession which appellant complains of here do not refer to the admission of the confession. We hold that the Court's prompt instruction, under the circumstances of the case, sufficient." *Griffin,* 486 S.W.2d at 950, citing *Blassingame v. State,* 477 S.W.2d 600 (Tex.Cr.App.1972) and *Craig v. State,* 480 S.W.2d 680 (Tex.Cr.App.1972). In the case before us, neither the confession of Randle nor that of Wilkerson was introduced into evidence before the jury. As such there is no direct violation of the Supreme Court's holding in *Bruton.* The trial court immediately sustained appellant's objection to the prosecutor's question and immediately instructed the jury to disregard same. Given the record before us, we hold that the trial court's instruction to disregard the question asked by the prosecutor was sufficient to cure any error concerning appellant's right to cross-examination. Appellant's third point of error is overruled.

In his fourth point of error, appellant contends that the prosecutor improperly impeached a State's witness without laying the proper predicate for impeachment of one's own witness.

State's witness, Wanda Phillips testified on direct that she had asked appellant how he had cut his hand. She testified that appellant said, " 'Oh it ain't bad. It ain't nothing I can't handle' and I said, 'How it happen?' He say, 'Well, Junior Boy [Randle's nickname] was reaching for a knife and the other guy was grabbing for it and Junior Boy cut him, snatched [the] knife out of his hands and cut him.' " Wanda Phillips testified that this is what appellant had told her on the night after the murders.

On cross-examination, defense counsel elicited the following:

"Q. Do you remember being here this morning?

"A. Yes.

"Q. Do you remember me asking you to come in to the jury room....

"A. Correct, next door.

\* \* \* \* \* \*

"Q. And did [appellant] tell you how he received that cut?

"A. Yes.

"Q. And did he tell you that he received that as a result of trying to stop Junior Boy from stabbing somebody.

\* \* \* \* \* \*

"A. Correct.

"Q. And when I talked to you in the jury room at about 10:30 this morning when I asked you how he received that cut that is what you told me?

"A. Yes.

\* \* \* \* \* \*

"Q. And that's what he told you when he very first came back to your apartment, isn't that correct? When he came back with the other two that night when he went into the bathroom?

"A. Yes.

"Q. Did you also overhear a conversation between, when you were in the front room there, that you later learned to be [Wilkerson] and [Randle] and [appellant]? Did you overhear a conversation wherein they told you (sic) that [appellant] had nothing to do with those killings?

"A. Yes, I did hear it.

"Q. And you testified in both of those trials that on more than one occasion while they were there in that apartment that they told you that you heard them say to you that he didn't have one thing to do with it. That they did it all, isn't that true?

"A. Correct."

On redirect examination, the prosecutor showed Phillips two prior statements she had given to the police on July 2nd, and July 7th, 1983. He asked her where in the statements she had indicated she was told by appellant that he tried to stop Randle from killing somebody. Over appellant's objection that the prosecutor was impeach-

ing his own witness[7], Phillips testified that, "No, I didn't say that in the statement." Later on redirect, the prosecutor asked Phillips to read certain portions from the statement that she had given to police on July 7th. Again over objection that the prosecutor was attempting to impeach his own witness, Phillips read:

"When I asked how Pony had cut his hand he told me that he had a knife in his hand and James [Randle] had asked for it and just then one of the guys who they had killed tried to grab the knife. This is where [appellant's] hand was cut. James got the knife away from him from that man."

After Phillips read from her statement, the prosecutor asked her if that statement were true. She responded that the statement was true. The prosecutor elicited the following:

"Q. Then why did you tell [the defense attorney] all these things that you've told him?

"A. Because I don't want to be bothered with talking to everybody. I don't want to be involved in this stuff and didn't with all these investigators, D.A. and lawyers. It's not me.

　　*　　*　　*　　*　　*　　*

"Q. So what you related to [the defense attorney] in the jury room next door is not the truth?

"A. This is what Pony have (sic) told me since he has been locked up."

Phillips further testified that she had visited appellant in jail but had decided not to see him anymore. He, however, repeatedly telephoned her even after she had the number changed to prevent him from calling.

The prosecutor asked Phillips to read from her statement given to police on July 2nd. Without objection, she read:

"I saw Pony had a cut on his hand.... On his inside of his fingers on one hand. Which one I don't know. James was going around apologizing about cutting him on his hand and Pony told me that he

had the knife and the other guy was trying to get the knife. James reached in front and grabbed the knife and pulled it out of Pony's hand and cut Pony's hand."

■ To impeach a witness means adducing proof that such witness is unworthy of belief or credit. *Brown v. State*, 475 S.W.2d 938, 952 (Tex.Cr.App.1971) overruled for other reasons in *Bradford v. State*, 608 S.W.2d 918 (Tex.Cr.App.1980). A mere showing that the State has introduced prior inconsistent statements of witnesses called to testify on its behalf does not automatically constitute impeachment. See, e.g., *Jackson v. State*, 516 S.W.2d 167, 175–176 (Tex.Cr.App.1974).

■ In this case, Phillips told the jury that appellant had returned to her apartment with a cut hand and that the hand had been cut, she was told, when appellant attempted to remove the knife from Randle's hand. On cross-examination, defense counsel elicited testimony that the hand was cut when appellant attempted to stop Randle from killing the young men in the bathroom. It was perfectly acceptable for the State on redirect to have Phillips contextualize the testimony she had given on cross-examination. *Williams v. State*, 604 S.W.2d 146, 149 (Tex.Cr.App.1980); *Villarreal v. State*, 576 S.W.2d 51, 58 (Tex.Cr.App.1978); *Brown*, 475 S.W.2d at 952. This is what Phillips did when she related that appellant had told her this while in jail and that he constantly attempted to contact her even after she had changed her phone number. Here, as in *Jackson*, the State was not attacking the credibility of Phillips. Indeed, the State's case was dependent upon the jury believing this witness. The State did not impeach its own witness. Appellant's fourth point of error is therefore overruled.

■ In his fifth point of error, appellant asserts that the trial court erred in permitting the prosecutor to read from Phillips' statement wherein she related to police officers that appellant had taken the

---

7. The trial of this case occurred prior to adoption of TEX.R.CRIM.EVID. 607, which allows the credibility of a witness to be attacked by any party, including the party calling him or her.

knife from her home. Again, as in his previous point of error, appellant asserts that the prosecutor's actions constituted improper impeachment of one's own witness. The State in its brief insists that the prosecutor was merely refreshing the memory of the witness and was therefore proper. We find, however, that issue has not been preserved for our review.

Phillips had testified that appellant and Randle had picked up a knife that was in her dish drainer. She, however, could not remember who actually held the knife when one or the other picked it up. The witness was cross-examined and on redirect was told by the prosecutor to "[r]efresh your memory if you would about who had the knife in his hand and who left with that knife in his hand." Referring to her prior statement made to police officers, Phillips testified:

> "It saying (sic) the last time that he came over it was about 9:30 p.m. That time Pony [appellant's nickname] went into my kitchen. I heard James say, 'Oh man, this is one that we can use.' Then I saw Pony with my butcher knife.... Pony had this knife in his hand."

The witness read this statement without objection. Appellant, however, attempts to rely upon the objection made when the witness was asked, "Does it say anywhere in this statement that the Defendant Kenneth Ransom had gone there and was playing games and had gone to the bathroom when he discovered two people killed and he tries to stop Junior Boy from killing somebody else?" When this question was asked, some six questions before the aggrieved question, appellant made his "improper impeachment" objection. No objection was voiced when the aggrieved state-

ment was read before the jury. Having not properly objected, appellant has not preserved error, if any, for our review. Tex.R.App.P. 52(a). See *Marini v. State*, 593 S.W.2d 709, 716 (Tex.Cr.App.1980). The fifth point of error is overruled.

■ In his sixth point of error, appellant asserts that the trial court did not comply with what he calls the "mandatory requirements" of Article 36.27, V.A.C.C.P.

Among the copies of the papers filed in the trial court, there is a document entitled "JUROR'S REQUEST." Signed by the foreman of the jury and addressed to the trial court judge, it reads, "Please supply us with the part of Wanda Phillips (sic) testimony which took place in her bathroom when Ransom was there with the cut hand." The request is dated June 15, 1984, and was filed stamped by the clerk of the court at 5:53 p.m. The copy of the trial court's docket sheet makes no mention of the note. That part of the docket sheet dated June 15, 1984, reads that:

> "[a]t 4:40 p.m. the court allowed jury to separate so that they may move their cars. [ (This was done with appellant's acquiescence.) ] At 5:00 p.m. the jury returned and resumed deliberations. At 6:30 p.m. the jury returned into open court with a verdict on Special Issue # 1: Answer Yes; Special Issue # 2: Answer Yes."

Appellant alleges that the request evidences the trial court's failure to comply with Article 36.27 because the record does not show that the trial court responded to the note in writing and in open court.[8]

Assuming without deciding that Article 36.27 governs the procedure to be followed

---

**8.** Article 36.27, V.A.C.C.P., in part, provides that: "When the jury wishes to communicate with the court, it shall so notify the court thereof. Any communication relative to the cause must be written, prepared by the foreman and shall be submitted to the court through the bailiff. The court shall answer any such communication in writing, and before giving such answer to the jury shall use reasonable diligence to secure the presence of the defendant and his counsel or objections and expectations, in the same manner as any other writ- ten instructions are submitted to such counsel, before the court gives such answer to the jury, but if he is unable to secure counsel, then he shall proceed to answer the same as he deems proper. The written instruction or answer to the communication shall be read in open court unless expressly waived by the defendant.

"All such proceedings in felony cases shall be part of the record and recorded by the court reporter."

under the fact situation here presented [9], absent a timely objection concerning non-compliance with Article 36.27, nothing is preserved for our review. Tex.R.App.P. 52(a); *Hawkins v. State*, 660 S.W.2d 65, 80–81 (Tex.Cr.App.1983); *Edwards v. State*, 558 S.W.2d 452, 454 (Tex.Cr.App. 1977). Appellant's sixth point of error is overruled.

### The Punishment Phase of Trial

■■■ In his twelfth point of error, appellant contends that Article 37.071(b)(1), V.A.C.C.P. is unconstitutional. His specific complaint is that Article 37.071 does not permit him to introduce testimony relative to the mitigation of punishment in this case because the State relied upon a party's theory of culpability. We disagree.

The State relied upon a party's theory of culpability in the guilt/innocence phase of trial. In the punishment phase of trial, however, appellant is not restricted in his presentment of mitigating evidence. See Article 37.071, supra. As we discussed in *Green v. State*, 682 S.W.2d 271 (Tex.Cr. App.1984):

> "[T]he special issues themselves clearly focus the jury's attention on the individual defendant, and indeed must do so in order to give the individualize examination required under *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) and *Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976). While the law of parties can apply to *convict* an accused of capital murder, the death penalty may be imposed only by examination of the mitigating and aggravating circumstances concerning the *individual* defendant. *This examination is performed in Texas through the special issues.*" 682 S.W.2d at 287 (emphasis in the original, emphasis added and citations omitted).

See also *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Woodson v. North Carolina* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976); *Quinones v. State*, 592 S.W.2d 933, 947 (Tex.Cr.App.) *cert. denied*, 449 U.S. 893, 101 S.Ct. 256, 66 L.Ed.2d 121 (1980).

*Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976), expressly upheld the constitutionality of the manner in which mitigating evidence is considered under the special issues submitted to Texas juries per Article 37.071. Complying with *Jurek*, *Lockett* and their progeny, this Court has resolutely declared that a defendant in any capital murder case is free to ask the jury to consider whatever evidence of mitigating circumstances the defense can bring before it. See *Quinones*, 592 S.W.2d at 947. See also *Cordova v. State*, 733 S.W.2d 175, 189–190 (Tex.Cr.App.1987) cert. denied, 487 U.S. 1240, 108 S.Ct. 2915, 101 L.Ed.2d 946 (1988); *Johnson v. State*, 691 S.W.2d 619, 625–626 (Tex.Cr.App.1984) cert. denied, 474 U.S. 865, 106 S.Ct. 184, 88 L.Ed.2d 152 (1985); *Stewart v. State*, 686 S.W.2d 118, 121 (Tex.Cr.App.1984) cert. denied, 474 U.S. 866, 106 S.Ct. 190, 88 L.Ed.2d 159 (1985). As such, because first, the special issues submitted pursuant to Article 37.071 focused the jury's attention on the individual acts of appellant and second, because we have consistently held that a capital murder defendant must be given the utmost latitude in presenting to the jury any evidence that may mitigate his punishment, we hold that appellant was not denied the opportunity to present such evidence in the punishment phase of trial although the State relied on a party's theory of culpability in the guilt/innocence phase of trial. Consequently, Article 37.071 is not unconstitutional as applied to appellant. We overrule appellant's point of error number twelve.

---

9. We note that the more specific statute dealing with a juror's request for testimony is provided in Article 36.28 V.A.C.C.P., which, in pertinent part, reads:

"In the trial of a criminal case in a court of record, if the jury disagree as to the statement of any witness they may, upon applying to the court, have read to them from the court reporter's notes that part of such witness testimony or the particular part in dispute, and no other...."

*The Record on Appeal*

In his point of error number seven, appellant contends that the trial court improperly overruled his objection to the record on appeal. Omitted from the appellate record were complete copies of pages from a scrapbook that the District Attorney maintained. The scrapbook had been introduced into evidence as a bill of exception at the hearing on appellant's motion for a change of venue. It contains numerous pages; most pages contain more than one article cut out from either a newspaper or magazine pertaining to various aspects of criminal law.

After reviewing the record and appellant's objection thereto, we ordered the trial court to supplement the record on appeal with complete copies of those pages of the scrapbook to which appellant had objected on appeal. See Tex.R.App.P. 55(c). The trial court has complied with this order and a complete copy of the scrapbook is now before us. Appellant's point of error number seven is therefore moot—he has not been denied his right to a complete record on appeal.

The judgment is affirmed.

CLINTON, J., joins only the judgment of the Court.

DUNCAN, J., not participating.