**Tim RULE, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 06–93–00159–CR.**

Court of Appeals of Texas,
Texarkana.

Dec. 6, 1994.

Discretionary Review Refused
March 8, 1995.

William K. Gleason, Jefferson, for appellant.

James P. Finestrom, Jefferson, for appellee.

Before BLEIL, GRANT and CHADICK, Retired, Sitting by Assignment, JJ.

## OPINION

GRANT, Justice.

Tim Rule appeals from his conviction for capital murder. He contends that the trial court erred by admitting taped statements that he made in response to police interrogation; that the court erred in overruling his motion to suppress evidence obtained through an illegal arrest; that the court erred in overruling his motion to transfer venue; and that the evidence was factually insufficient to support the jury's finding that he was guilty of murder.

The undisputed evidence shows that two men, Eddie Wardlaw and Cedric Baker, were shot and killed in an execution-style slaying in a club owned by Louanne Larson at Lake of the Pines. The undisputed evidence also shows that Tim Rule, Louanne Larson, and

Tim Rice were alone in the club with the two victims when they were killed. There is no evidence that Tim Rule shot either of these individuals.

Tim Rice, who was a State's witness, testified that on the afternoon before the murders, while driving around, he had picked up Baker, gone to Cheryl Riggs' home and met Wardlaw. Late that night, Riggs and Rice then went to the club, where they, Rule and Larson used drugs. Rice testified that Larson thereafter asked him to bring Wardlaw to the club. Rice took Riggs home, picked up Wardlaw and Baker, and returned to the club.

There is evidence that Larson believed that Wardlaw had stolen about $200 from her till at "Lou's Place" while working as a doorman there. After Rice brought Wardlaw and Baker to the club, he took them into the office. Rice testified that while Rule cleaned the club, Larson shot Wardlaw, handed him (Rice) the gun, and ordered him to shoot Baker. Rice shot Baker.

There is also evidence that Rice and Rule then wrapped the bodies in plastic bags and wire and placed them into large garbage cans which they loaded into Larson's automobile, transported them over a hundred miles, and dumped the bodies beside the road. There is testimony from Pamela Smith that Rule and Rice stopped at her home near the area where the bodies were left, and that Rule showed her the 9mm pistol and asked her for help to clean it. After they returned, Larson and Rule carried the pistol to Larson's aunt in Mount Pleasant and traded it to her for a .25 caliber automatic of much less value—under the pretext that the gun was too heavy.

Tim Rice then took Rule's pickup truck and fled. Shortly thereafter, Rice contacted the police and informed them of the shootings (of which they were previously unaware) and presented them with one version of the events leading up to the deaths. Based on this information, the officers prepared an affidavit with the assistance of the district attorney's office. They presented the affida-vit to a magistrate and obtained arrest warrants.

Armed with arrest warrants for Rule and Larson, the officers went to Larson's apartment and, finding both Rule and Larson there, arrested them. Five minutes later, Larson signed a consent to search her apartment and shortly thereafter signed a consent to search her car and the club.

Larson informed the officers of the whereabouts of her pistol, and they recovered it from Larson's aunt. Forensic analysis of the bullets found in the bodies showed that the deaths were caused by her 9mm pistol. Blood-stained clothing was discovered during the search of her home. The blood was identified as Wardlaw's, and the stain was caused by blood spatter from a bullet wound. Blood stains found in her office matched both Wardlaw and Baker.[1] Blood stains in her car were identified as Wardlaw's.

Rule made several statements to the police at different times. The trial court admitted his second statement into evidence, and also admitted the statement that he made after recapture in Mexico. When this case was originally tried, a hung jury caused a mistrial. Rule and Larson jumped bail and fled the country, but were recaptured in Mexico two days later. Although Tim Rice testified at the first trial, he refused to do so at the second trial; thus, his recorded testimony was entered into the evidence on the second prosecution of the case. Rule and Larson were each found guilty of the offense of capital murder and were sentenced to imprisonment for life as required by statute.

## POST–ARREST STATEMENTS

Rule first contends that the trial court erred by admitting into evidence audio tapes of a statement that he made to the police after his arrest. His contention relies solely upon cases interpreting the federal constitution. We therefore limit our review to that theory. Rule argues that he had requested counsel prior to the making of the statement and that the continued questioning was therefore in violation of his constitutional

1. Although the office had been thoroughly cleaned, a criminal investigation team found mi-nuscule droplets of blood on the ceiling and walls.

right to counsel. Rule had requested the assistance of counsel immediately prior to the cessation of questioning during his previous interrogation.

## STANDARD OF REVIEW AT SUPPRESSION HEARING

On a motion to suppress evidence, the trial judge is the sole and exclusive trier of fact and the judge of the credibility of witnesses, including the weight to be given their testimony. *Romero v. State,* 800 S.W.2d 539, 543 (Tex.Crim.App.1990). Thus, the trial court is free to believe or disbelieve the testimony of any witness. This Court does not engage in its own factual review, but determines whether the trial judge's findings are supported by the record. If they are supported, this Court is not at liberty to disturb them. *Etheridge v. State,* No. 71,189, 1994 WL 273325 (Tex.Crim.App. June 22, 1994); *Upton v. State,* 853 S.W.2d 548 (Tex.Crim.App.1993); *Cantu v. State,* 817 S.W.2d 74, 77 (Tex.Crim.App.1991).

The State argues that Rule initiated the interrogation, thus waiving his right. To establish a waiver, the State must demonstrate that the accused intentionally relinquished a right of which he was aware. *Muniz v. State,* 851 S.W.2d 238, 253 (Tex.Crim.App.1993). Whether a waiver is shown must depend in each case upon the particular facts and circumstances surrounding the case, including the background, experience, and conduct of the accused. If the State's evidence shows nothing more than that the accused responded to further police-initiated custodial interrogation, a valid waiver is not shown. *Smith v. Illinois,* 469 U.S. 91, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984); *Muniz, supra.*

The State contends that Rule's request for an attorney was equivocal and did not meet the required level of clarity to require the officers to stop questioning him. A suspect must articulate his desire to have counsel present sufficiently that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. *Davis v. United States,* 512 U.S. ——, ——, 114 S.Ct. 2350, ——, 129 L.Ed.2d

362, 371 (1994). The initial request was restated by Officer Brantley and confirmed by Rule:

> BF [Officer Brantley Foster]: When we ended the other statement a while ago, you said, 'I don't want to talk to anybody else without my lawyer.' You remember making that statement?
>
> TR [Tim Rule]: Yes sir.

The statement "I don't want to talk to anybody else without my lawyer" is an unequivocal, clear statement by Rule that he wanted an attorney. At that point, it became incumbent upon the State to establish that Rule initiated further interrogation. The following interrogation was made by Officer Brantley Foster:

> BF: OK. Has anybody threatened you or anything about your lawyer since you made that statement?
>
> TR: No sir.
>
> BF: Do you want to talk to us any further without a lawyer?
>
> TR: [no response]
>
> BF: It's up to you.
>
> TR: Well ...
>
> BF: You have the right to have a lawyer if you need one. You know if you need one or not. We don't know. We can't make that determination for you. You're the only one that can decide that. And, as you said whenever I started to walk out of here while (sic) ago, you said, "Well, you know there's something else that happened here and I want to tell you about it." And I said, "Well, let's wait a minute till we get another tape recorder." Now, you either want to tell us or you don't. And you either want your attorney or you don't. It's up to you.
>
> TR: Umm, I want the truth to come out. I've told you a couple of things on that tape, on the other tape that were the truth but they didn't fall in the proper order.
>
> BF: Okay. Do you want ..., but I think I told you that I knew that.
>
> TR: Uh-huh.
>
> BF: But do you want to continue to waive your right to counsel at this point?

TR: Uh, I want to cooperate but I don't want to go to prison for something I just ... I didn't do.

HD [Officer Howard Dunham]: You're not goinna (sic) go to prison for something you didn't do.

BF: That's right.

HD: We can promise you that. If you hadn't done anything, you're not gonna go to prison.

TR: See, here's the ... if I did something that I was forced to do, I didn't report it in fear for my life and my family's life, but I was still there.

BF: But, do you want to talk to us? Do you want your lawyer here right now?

TR: I want to talk to my lawyer to find out exactly what I'm up against.

BF: You're up against a capital murder charge. That, that's what you're up against. But ...

TR: Me telling you this ...

BF: Okay.

TR: ... is just like saying, you know, this is the way it was whether I'm in front of a jury or not, this is going to be turned over as evidence.

BF: Most, it is evidence at the trial. That's why we read you your rights to start with and that's why we had the judge read you your rights so that you'd know what they were, but ... He continues to indicate that he wants a lawyer. He wants one and he doesn't want one and we're gonna, I think that what we should do [at] this point is discontinue this interview and we'll work it out in the Courthouse.

TR: I want to tell you what happened but I'm scared.

BF: Who are you scared of?

TR: I'm scared of the one person that I don't know where [ ...]

BF: I don't think that we need to be continuing this conversation as long as you have invoked your right to counsel and so at this point, this interview is ended. The time is 3:10 p.m. This will be [a] final conversation with this defendant at this time.

The officers questioning Rule terminated the questioning saying "as long as you have invoked your right to counsel and so at this point, this interview is ended." It is clear that the officers themselves believed that Rule had invoked his right to counsel, and had not thereafter withdrawn the exercise of his rights to an attorney. Rule clearly requested an attorney be present during the first conference, and the State has not met its burden to show that Rule then waived this right during this statement.

We must next look at the evidence to see if the State had fulfilled its burden by showing that Rule initiated further contact after this request. The State offered no evidence to show that Rule initiated contact. Officer Howard Dunham testified on cross-examination about when the statement in question was obtained:

Q I think the question is on the 25th when you started this statement, and like he had on the 20th, he said I want to talk to my lawyer to find out what I'm up against. That from that point forward, any contact that you had with Tim Rule was initiated by you. You went and got him. You brought him to the telephone.

A No, I didn't go get him.

Q Who did?

A Somebody in the jail.

Q Well, did you send after him?

A Well, yeah, I'm sure I did.

Q You sent after him to get him down there to talk to the lawyer, to do these kinds of things to get this statement taken.

A Well, I wouldn't necessarily say that. He wanted to talk to the lawyer. I believe he had already talked with James Wedding prior to that. I'm not sure.

Q Of course, if Mr. Wedding was here, he could tell us that, I'm assuming.

A I'm sure he could be available.

Q But the point is, you asked that Mr. Rule come down to that office.

A I don't remember saying that, but that's very likely to be true.

Q And anything that occurred with respect to conversation on the telephone with the lawyer, with respect to this taped conversation that you've identified, occurred after you sent up to get Mr. Rule to come down.

A It occurred after he talked to his attorney, that's correct.

Q But after you sent to get him to come down to talk to his lawyer, whatever he was down there for.

A After he talked to his lawyer, yes.

Q He talked to his lawyer in your presence as a matter of fact.

A I was in the room.

Q Did you make the call?

A I did dial the number.

In *Freeman v. State,* 723 S.W.2d 727, 732 (Tex.Crim.App.1986), the Court held that under *Miranda*[2] and *Edwards*[3], "Once a defendant invokes his right to counsel, he may not be subjected to further interrogation until counsel is *present,* unless the defendant himself initiates dialogue with the authorities." (Emphasis added.)

At the time that the statement in evidence was taken, Rule was taken from his cell to an office, five days after he had invoked his right to counsel. The applicable law is clearly set forth in *Minnick v. Mississippi,* 498 U.S. 146, 153, 111 S.Ct. 486, 491, 112 L.Ed.2d 489, 498 (1990):

> In our view, a fair reading of Edwards and subsequent · cases demonstrates that we have interpreted the rule to bar police-initiated interrogation unless the accused has counsel *with him* at the time of questioning. Whatever the ambiguities of our earlier cases on this point, we now hold that when counsel is requested, interrogation must cease, and officials may not reinitiate interrogation without counsel present, *whether or not the accused has consulted with his attorney.*

(Emphasis added.) This language was quoted in *Murphy v. State,* 801 S.W.2d 917, 919 (Tex.Crim.App.1991).

 It was error for the officers to question Rule after he had requested counsel in an interview initiated by the police when counsel was not present, and it was error to admit this statement over Rule's objections. Improperly admitted evidence does not call for reversal if the reviewing court determines beyond a reasonable doubt that admission of the evidence did not contribute to the conviction or punishment. *Harris v. State,* 790 S.W.2d 568 (Tex.Crim.App.1989). This rule applies to an illegally obtained confession. *See e.g., Milton v. Wainwright,* 407 U.S. 371, 377, 92 S.Ct. 2174, 2178, 33 L.Ed.2d 1 (1972) (error in admitting challenged confession was harmless in light of other evidence that was admitted, including other confessions); *Beck v. State,* 712 S.W.2d 745 (Tex.Crim.App.1986) (confession obtained in violation of right to counsel was harmless).

The State notes that there is no evidence of coercion or badgering or any claim of such, thus suggesting that the rationale for the *Minnick* rule does not apply to the present case. However, that argument was also made to and rejected by the Court of Criminal Appeals in *Murphy.*

 The State also argues that admission of Rule's statement was harmless error because a different statement containing the same information was taken after his rearrest in Mexico that was properly admitted into evidence. The rubrics in *Harris v. State,* 790 S.W.2d 568, require two general considerations in applying the harmless error rule: First, isolate the error and all its effects and any other consideration suggested by the facts of the individual case, and second, ask whether the rational trier of fact might have reached a different result if the error and its effects had not resulted. The United States Supreme Court also requires this harmless-error test. *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

The court in *Harris* instructs that the reviewing court be concerned with the integrity of the process leading to the conviction by examining the source of the error, the

---

2. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

3. *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).

nature of the error, whether or to what extent it was emphasized by the State, and its probable collateral implications. Further, the court should consider how much weight a juror would probably place upon the error and whether declaring the error harmless would encourage the State to repeat it with impunity.

The first statement (the long statement) by Rule consists of forty-seven pages; the later statement (the short statement) by Rule consists of two-and-a-half pages and was made before an FBI agent on August 4, 1993. In both statements, Rule denies any knowledge of the killing prior to the event. In the long statement, Rule stated that he took "Eddie" and "this black guy" back to the office where Larson was. Then he left the office and went back into the club and "flipped ... the volume knob on the jukebox because I had ... put money in it, picked out a bunch of songs and I was listening to some good rock and roll.... I was rockin' the house, you know." In the short statement, Rule said, "I left the office and closed the door behind me. I then put on some music in the juke box (sic) and began doing some paperwork." Nothing in the short statement suggests that he turned the jukebox up to a loud volume. He admits participation in disposing of the body, but in both statements he takes the position that fear caused him to assist Tim Rice in disposing of the bodies. In the long statement, he relates that Rice stuck a gun in his face and said, "I killed those two, I can kill you just as easy.... you're going to help me." In the short version, he does not relate that Rice put the gun in his face, but does state that Rice had a dark-colored gun in his hand. In the long statement, Rule testified that Rice threatened to do harm to his family and Louanne Larson if he did not keep his mouth shut. The short statement did state that, "He [Rice] made several threats against my well being if I gave him up." In the long statement, Rule relates that he never touched the bodies of the victims while loading them into the car trunk. In the short statement, he relates that he helped Rice place the bodies in trash cans and then into the trunk of Louanne Larson's automobile. In the short statement, Rule indicates that he drove the

vehicle while Rice followed him in another car, which was returned to the home of another person. In both versions, Rule admits to helping Rice unload the bodies and cover them with brush and leaves. In the long version only, Rule suggests that he was tied up in the car by stating that Rice untied him so that he could help remove the bodies. In the long statement, Rule discusses accompanying Larson to her aunt's home, where the murder weapon was traded to her aunt for another pistol. This statement does not appear in the short statement. However, Larson's aunt, Susan Sanchez, testified about the gun swap and testified that Rule accompanied Larson to her home on the day this switch was made.

The erroneously admitted statement in the present case tells Rule's detailed version of what occurred before, during, and after the killing of Wardlaw and Baker. The source of the error was the officer's erroneous belief that if he obtained consent from the defendant's attorney to take a statement from the defendant, then it could be done without the attorney being present. This is not an illogical conclusion because the wording of the required warnings tell the defendant that he is entitled to an attorney. It would thus seem that once he has an attorney, if the attorney is agreeable to the statement, then there would be no bar to its admissibility.

■ The State's theory of Rule's involvement at the time of the shooting was that he had turned the jukebox up so that people would not hear the gunshots. This was a key element to the State's case, because it would suggest that Rule knew the killings were about to occur and it would show his participation in trying to hide the sounds of the gunshots. The prosecutor emphasized this in the final argument when he said:

Rule's very first statement, the one that you heard, November 25th, said, "I turned up the volume of the stereo." I mean, Rule said that himself. It's a given. It's a fact in this case.

... [I]t shows Rule had knowledge that a shooting is going to occur and then he turns up the music so the bullets aren't heard. People passing by out there, if

anyone's around, is not going to hear that gunshot in the middle of the night.

. . . .

... You know, here's Rule turning up the music when the guns are being fired.

These excerpts from the final argument show that the State put a great deal of emphasis on the statement that should have been excluded from the evidence. We cannot say beyond a reasonable doubt that this evidence did not affect the jury and contribute to the conviction and punishment. This point of error is sustained.

## ADMISSION OF ITEMS SEIZED PURSUANT TO CONSENT

Rule next contends that the trial court erred by admitting evidence obtained through a search of Larson's apartment, car, and business establishment. He contends that they were arrested under an invalid warrant and that the taint inherent to this illegal arrest extended to Larson's consent to the search.

### The Arrest Warrant

The first part of this argument is based upon Rule's contention that the affidavit upon which the arrest warrant was obtained was legally inadequate. The affidavit is a preprinted form stating that:

> I, ____, do solemnly swear that I have good reason to believe, and do believe and charge that on or about the ____ day of ____ A.D. One Thousand Nine Hundred and ____ and before the making and filing of this complaint, in the County of ____, and State of Texas, ____ did then and there unlawfully. . . .

The blanks were filled in with the appropriate names and dates, and the empty space beneath the preprinted form describes the crime committed. This exact form was reviewed and found wanting in *Miller v. State*, 736 S.W.2d 643 (Tex.Crim.App.1987) (opinion on rehearing). That affidavit was found insufficient to establish probable cause because it contained the specific language that had previously been condemned in *Green v. State*, 615 S.W.2d 700 (Tex.Crim.App. [Panel Op.] 1981), *cert. denied*, 454 U.S. 952, 102 S.Ct. 490, 70 L.Ed.2d 258 (1981). In those cases,

as in the present case, the affidavit stated that the affiant "has good reason to believe and does believe and charge," rather than containing factual statements setting out allegations of personal knowledge or other sources for the complainant's belief. The affidavits then continued, as does the affidavit in this case, by reciting the statutory elements of the charged offense. As in those cases, this affidavit also consists of nothing more than the officer's conclusion that the accused perpetrated the murder described in the complaint.

Before a warrant for arrest can be issued, the Constitution requires that the judicial officer issuing such a warrant be supplied with sufficient information to support an independent judgment that probable cause exists for the warrant. *Green, supra,* citing *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). Following the precedent set by the *Green* case, we are constrained to conclude that the affidavit provided the judge with no basis for an independent determination of probable cause and that the arrest warrant issued pursuant thereto was invalid. *Green*, 615 S.W.2d at 706; *see also Rumsey v. State*, 675 S.W.2d 517 (Tex.Crim.App.1984).

### Standing To Exclude Evidence

The remaining question is whether the illegality of the arrest warrant requires that all evidence seized as a result of the search made after the illegal arrest should be excluded. We must first determine whether Rule has standing to contest the legality of these searches. When standing is an issue, the defendant bears the burden of proving that his own privacy rights were violated. *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978); *Flores v. State*, 871 S.W.2d 714, 720 (Tex.Crim.App.1993).

Examining the searched areas in turn, the evidence indicates that the automobile was owned by Louann Larson. In the absence of any evidence showing that a defendant had a legitimate expectation of privacy, a defendant lacks standing to complain of the search of a car owned by a codefendant. *Esco v. State*, 668 S.W.2d 358, 361 (Tex.Crim.

App. [Panel Op.] 1982). There is no evidence indicating any reason that Rule would have any expectation of privacy in the vehicle. Similarly, there is no indication that he should have any expectation of privacy in connection to a business owned by his codefendant.

 It is arguable that he may have had an expectation of privacy in the residence that he shared with Larson. The residence belongs to Larson, and there is no indication that he had any ownership or possessory interest in the residence. The evidence does reflect that they were living together in the apartment, but this area of contention has not been addressed by Rule in his brief. A defendant bears the burden of establishing a privacy interest in the premises searched. *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421; *Flores*, 871 S.W.2d at 720 n. 7. Rule has not done so. Nevertheless, if Larson's consent was valid, the search was valid. When two persons have equal access to use or occupy premises, either may give a consent to search, and evidence discovered may be used against either. *Spears v. State*, 801 S.W.2d 571 (Tex.App.—Fort Worth 1990, pet. ref'd).

**Larson's Consent to Search**

The remaining issue is whether the consent to search was invalidated by the illegal arrest. The Court of Criminal Appeals has concluded that there is no per se rule prohibiting the use of evidence obtained as a result of a consent search following an illegal arrest, stop, or detention. After an extensive discussion in *Juarez v. State*, 758 S.W.2d 772 (Tex.Crim.App.1988), the court listed the factors used to determine whether a confession given following an illegal arrest is sufficiently attenuated to permit the use of a confession at trial. The court concluded that those factors were also appropriate guidelines for determining whether evidence obtained through a consensual search following an illegal arrest was proper.

Those factors are (1) whether *Miranda* warnings were given; (2) the temporal proximity of the arrest and confession; (3) the presence of intervening circumstances; and (4) the purpose and flagrancy of the official misconduct. *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975).

In *Boyle v. State*, 820 S.W.2d 122, 131 (Tex.Crim.App.1989), the Court set out additional factors relevant to consider in measuring the attenuation of a taint as including whether the consent was volunteered rather than requested by the detaining officers, whether the arrestee was made fully aware of the fact that he or she could decline to consent, and whether the police purpose underlying the illegality was to obtain the consent.

 Evidence obtained from a warrantless but consensual search following an illegal arrest is admissible if the State proves by clear and convincing evidence that the consent was voluntarily rendered and that the preceding factors militate in favor of the conclusion that the taint inherent in the illegality of the arrest has dissipated. *Brick v. State*, 738 S.W.2d 676, 681 (Tex.Crim.App. 1987).

 In the present case, the first factor is satisfied because it is undisputed that *Miranda* warnings were given. The second factor is the temporal proximity of the arrest to the consent to search. The records introduced at the suppression hearing indicate that the arrest took place at 11:35 a.m. and that the consent to search was signed at 11:40 a.m. As noted by *Juarez*, this factor is often considered to be an ambiguous factor, noting that in some situations a prolonged detention may be "a more serious exploitation of an illegal arrest than a short one." *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979) (Stephens, J., concurring); *Bell v. State*, 724 S.W.2d 780 (Tex.Crim.App.1986).

There was very little time for any intervening circumstance to occur that would avail the State in this situation. *See Woods v. State*, 806 S.W.2d 351, 354–55 (Tex.App.— Texarkana 1991, pet. ref'd). Although this factor falls in favor of Rule, it is difficult to give it alone much weight without consideration of all other factors. *Juarez*, 758 S.W.2d at 782.

The fourth factor is the purpose and flagrancy of the official misconduct. There is no indication of any misconduct by the police officers in this situation. The affidavit was prepared by the district attorney's office after the officers came to them and informed them about the information that they had acquired. The testimony shows that the officers had the personal knowledge necessary to properly obtain a search warrant and that the information was inadequately transferred to the affidavit presented to the issuing judge. There is also no indication or allegation of any coercion, duress, or other improper act by the officers at the time that they obtained the consent. *Boyle* and *Juarez* both involve situations where probable cause to arrest did not exist in any fashion before the arrests occurred, and officers testified that their purpose in making the arrest was to create a situation where a consent to search might be obtained. Although the officers in this case testified that they hoped to obtain a consent, the arrest was not staged in order to obtain the consent. Probable cause for the arrest existed but was not adequately presented to the issuing judge. Thus, this factor falls in favor of Rule.

In determining whether Larson was fully aware of her right to refuse consent, one additional fact in this case comes down strongly in favor of finding that the search was not an improper result of the illegal arrest: Larson was a certified peace officer and had been a member of the Pittsburg police department.[4] Thus, her knowledge would be greater than that of the general public and guarantees that she would be fully aware of her right to refuse the request to search. This militates in favor of the conclusion that she was well able to exercise her free will and decide whether to consent to the search.

From a totality of the circumstances, it appears that the taint of the illegal arrest was sufficiently attenuated to validate the consent to search and thus make the discovered evidence admissible. *See Myers v. State,* 680 S.W.2d 825 (Tex.App.—Amarillo

1984, pet. ref'd). Thus, the evidence was properly admitted.

## VENUE

 Rule next contends that the trial court erred by refusing his motion for a change of venue because of prejudicial pretrial publicity surrounding the case. The Code of Criminal Procedure provides that a change of venue may be granted if "there exists in the county where the prosecution is commenced so great a prejudice against [a defendant] that he cannot obtain a fair and impartial trial." TEX.CODE CRIM.PROC.ANN. art. 31.03 (Vernon 1989). The test to be applied in determining whether the court should grant a motion to change venue is whether "the outside influence affecting the community climate of opinion as to a defendant are so inherently suspect as to raise doubt about the likelihood of obtaining a fair and impartial jury." *Teague v. State,* 864 S.W.2d 505, 509 (Tex.Crim.App.1993); *Henley v. State,* 576 S.W.2d 66 (Tex.Crim.App. 1978).

In *Henley,* the court listed several factors relevant in determining whether an outside influence affecting the community climate of opinion as to the defendant is inherently suspect. These factors include: (1) the nature of pretrial publicity and the particular degree to which it has circulated in the community, (2) the connection of government officials with the release of publicity, (3) the length of time between the dissemination of the publicity and the trial, (4) the severity and notoriety of the offense, (5) the area from which the jury is to be drawn, (6) other events occurring in the community which affect or reflect the attitude of the community or individual jurors toward the defendant, and (7) any other factor likely to affect the candor or veracity of the prospective jurors on voir dire. *Id.*

 Jurors do not have to be totally ignorant of the facts and issues of a particular case. *Ransom v. State,* 789 S.W.2d 572, 579 (Tex.Crim.App.1989), *cert. denied,* 497

---

**4.** The record does not clearly reflect when her employment with the police department ended. It does reflect that she was employed by the police department within two or three months of her arrest.

U.S. 1010, 110 S.Ct. 3255, 111 L.Ed.2d 765 (1990). In order to prevail, a movant must demonstrate that publicity about the case is pervasive, prejudicial, and inflammatory. *Teague v. State,* 864 S.W.2d at 510. When a motion for change of venue is denied, this Court reviews whether the trial court abused its discretion in refusing to grant the change of venue. *Id.* The motion for change of venue was accompanied by the affidavits required by Article 31.03, which were controverted by the State.[5]

Rule argues that the publicity surrounding the murder, their first capital murder trial and the subsequent hung jury and mistrial, and the escape to Mexico, recapture, and return to Marion County for trial all militate in favor of changing venue. He argues that the publicity resulting from these activities necessarily caused the requisite prejudice against him so that he could not obtain a fair and impartial trial. Counsel has not directed the Court to any testimony that would support his position. There are no references to the record under this argument, with the sole exception of citation to part of the record where the court overruled the motion to transfer venue. Counsel points out that the trial court struck for cause forty-five jurors out of a panel of ninety-five. Although the trial court did not render its decision until after voir dire was finished and the jury selected, the court had previously held a change of venue hearing as contemplated by Article 31 of the Code of Criminal Procedure. The court sent out questionnaires to the potential jurors to provide additional information, specifically asking whether they were familiar with the facts of the case, whether they had been exposed to media stories about the case, whether they had formed an opinion about the case, and if so, whether they could render a judgment based solely on the facts adduced at trial, whether the things that they might have heard, read, or seen about the case would influence them in reaching a verdict, or whether there was any

other reason that they could not sit as a juror and render a verdict based solely on the evidence presented.

Most of the panel stated that they were aware, to one degree or another, of the alleged facts and rumors surrounding the case, and many of them had seen media stories leading up to and about the previous trial. Such knowledge is not fatal to the jury selection process, so long as there is evidence that jurors could try the case strictly on the evidence before them. *Eckert v. State,* 623 S.W.2d 359, 363 (Tex.Crim.App. [Panel Op.] 1981). Even extensive knowledge in the community of either the crime or the accused is not sufficient by itself to render a trial constitutionally unfair. *Faulder v. State,* 745 S.W.2d 327, 339 (Tex.Crim.App.1987), *citing Dobbert v. Florida,* 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977).

The jurors selected all indicated on voir dire that they could and would decide the case on the evidence before them. The mere fact of media attention and publicity does not automatically establish prejudice or require a change of venue. *Teague,* 864 S.W.2d at 509, *citing Freeman v. State,* 556 S.W.2d 287, 297 (Tex.Crim.App.1977). As previously stated, it is not necessary for a juror to be completely unaware of publicity surrounding a particular offense. *Ransom,* 789 S.W.2d at 579.

There is sufficient evidence to support the trial court's determination that Rule could get a fair and impartial trial in Marion County. Under an abuse of discretion review, no error has been shown.

## SUFFICIENCY OF CORROBORATION EVIDENCE

For purposes of his argument, counsel in his brief assumes that there is evidence to support a finding that Rule murdered Eddie Wardlaw. He then contends that

---

**5.** Controverting affidavits are authorized under TEX.CODE CRIM.PROC.ANN. art. 31.04 (Vernon 1989):

> The credibility of the persons making affidavit for change of venue, or their means of

knowledge, may be attacked by the affidavit of a credible person. The issue thus formed shall be tried by the judge, and the motion granted or refused, as the law and facts shall warrant.

there is insufficient evidence to corroborate Rice's testimony that Rule either murdered or was a party to the murder of Cedric Baker.[6] The test is whether, after excluding the accomplice's testimony, there is other evidence of an incriminating character which tends to connect the defendant with the commission of the offense. *Munoz v. State*, 853 S.W.2d 558, 559 (Tex.Crim.App.1993); *Reed v. State*, 744 S.W.2d 112, 125 (Tex.Crim.App. 1988).

■ After excluding the accomplice testimony of Tim Rice, who apparently changed his story four different times and refused to testify at the second trial, the following evidence tends to connect Rule with the offense. There is testimony that Rule was in the club where the murders occurred when Rice brought Wardlaw and Baker to the club. Rule's statement to FBI agent Martinez places him at the club at the time of the shootings and indicates that he helped Rice dispose of the bodies. There is independent evidence that he had control of the weapon shortly after the murders and that he helped Larson dispose of the murder weapon. Rule's subsequent abortive effort to escape to Mexico also supports an inference of guilt.

Excluding the accomplice testimony, there was *sufficient evidence of an incriminating* nature tending to connect Rule to the commission of the offense of capital murder either as a party or as the principal.

Because we find that the erroneous admission of the first statement given by Rule was harmful error, we reverse the judgment of the trial court and remand the case for a new trial.

Concurring opinion by BLEIL, J.

6. Capital murder is defined in TEX.PENAL CODE ANN. § 19.03(a)(6), (b), *amended by* Act of May 29, 1993, 73rd Leg., ch. 900, § 1.01, 1993 Tex. Gen.Laws 3586, 3613. In relevant part, it provides that a person commits the offense if he commits murder and during the same transaction murders more than one person.

7. There is a serious question about whether Rule had any sufficient possessory interest in the searched premises to claim a legitimate interest

BLEIL, Justice, concurring.

I join in today's decision to reverse the trial court's judgment and remand the cause for a new trial.

The majority has correctly determined that Rule's forty-seven page statement was improperly admitted into evidence. The statement was taken in violation of Rule's rights under both the Fifth and Sixth Amendments of the United States Constitution. Well-settled case law supports this conclusion. *See Minnick v. Mississippi*, 498 U.S. 146, 153, 111 S.Ct. 486, 491, 112 L.Ed.2d 489, 498 (1990); *Murphy v. State*, 801 S.W.2d 917, 919 (Tex.Crim.App.1991).

Under Rule 81(b)(2), once an error is discovered, the appellate court is obligated to reverse the judgment unless the appellate court determines beyond a reasonable doubt that the error made no contribution to the conviction or to the punishment. TEX. R.APP.P. 81(b)(2); *Mallory v. State*, 752 S.W.2d 566, 570 (Tex.Crim.App.1988). I fully agree that we cannot conclude beyond a reasonable doubt that the improperly admitted statement made no contribution to the conviction or sentence.

However, I write separately to express my disagreement with the majority's treatment of the attenuation question, that question being whether Louanne Larson's consent to search was sufficiently attenuated from her unlawful arrest.[7] The majority errs in applying rules concerning the *voluntariness* of consent rather than rules concerning whether such consent is sufficiently *attenuated* from the initial unlawful arrest. And I disagree with the majority's analysis under the rules it applies. The reasons for my disagreement on this issue are more fully set forth in my dissenting opinion in *Larson. See Larson v. State*, 890 S.W.2d 200, 210–12

in privacy so as to have standing to complain of the search. *See, e.g., Chapa v. State*, 729 S.W.2d 723, 725 (Tex.Crim.App.1987) (defendant must show an expectation of privacy in place searched to establish standing to object to the search). Although I disagree with the majority's treatment of the attenuation question, under the facts of this case, I conclude that Rule lacks standing to complain of the searches of Larson's premises.

(Tex.App.—Texarkana 1994, no pet. h.) (Bleil, J., dissenting).

CORNELIUS, C.J., not participating.