# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---
### NO. 03-03-00685-CR
---

**Gonzalo Segura, Appellant**

**v.**

**The State of Texas, Appellee**

---
### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 403RD JUDICIAL DISTRICT
### NO. 3021904, HONORABLE BRENDA KENNEDY, JUDGE PRESIDING
---

### M E M O R A N D U M   O P I N I O N

A jury convicted appellant Gonzalo Segura of aggravated sexual assault of a child and indecency with a child by contact, and the trial court sentenced him to five years' imprisonment for the assault and three years for the indecency. *See* Tex. Pen. Code Ann. § 21.11 (West 2003) (indecency with a child), § 22.021 (West Supp. 2004-05) (aggravated sexual assault). On appeal, appellant argues that the trial court erred in allowing the testimony of certain witnesses, in allowing evidence related to a photographic lineup consisting only of appellant's photograph, in refusing appellant's request for a mistrial, and in refusing to allow appellant to present evidence of mistaken identity. Appellant also argues that the evidence is legally insufficient to support the convictions. We affirm the judgments of conviction.

**Factual Summary**

Y.G., a twelve-year-old girl, testified that she came to Austin from Mexico for a medical procedure in 1998 when she was eight.[1]  For somewhere between a few weeks and several months, she lived with her aunt, Reyna Perez, Perez's husband, and several cousins.  Y.G.'s father was either in Austin already or came to Austin shortly after Y.G. arrived, but he did not live with Y.G. at her aunt's house, and Y.G.'s mother came to Austin after Y.G.  Y.G. said that three other men also lived at her aunt's house; one was named Gonzalo and was a friend of her father's.  Y.G. did not know his last name, but identified appellant as Gonzalo.  Y.G. shared a room and bed with her three cousins, and she testified that Gonzalo came into the room one night while her cousins were asleep, unzipped Y.G.'s pants and touched her "private part" with his finger.  He touched her for several minutes but stopped when she moved and left the room without speaking.  Y.G. testified that sometime after this incident Gonzalo put his hand under her shirt after Perez had gone to work.  Finally, Y.G. recounted that Gonzalo touched her on the thigh when he was driving her, as well as his daughter K. and Y.G.'s cousins, to a flea market and told her she was going to be his girlfriend.

Y.G. testified that she waited "a while" to tell anyone about the touching because she was scared that her father would do something to Gonzalo and get in trouble.  The first person she told was her fourth-grade teacher, Hector Negrete.  Y.G. told Negrete about Gonzalo's touching after a police officer came to school and said that students could talk to her if they had any problems.  When Y.G. asked to talk to the officer, Negrete asked why, and Y.G. told him what had happened.

---

[1]  Y.G. had an interpreter translate questions asked of her from English into Spanish but said she was comfortable answering in English.

The State next called Negrete to testify. Appellant objected to Negrete's testimony as an outcry witness on grounds that Y.G.'s statement to him made no specific allegations, but only an "allusion of sexual abuse." After a hearing outside of the jury's presence, the trial court overruled appellant's objection and allowed Negrete to testify as an outcry witness. Negrete was Y.G.'s teacher in the 2000-2001 school year and at the end of the year, he presented a program about unwanted touching, during which a student asked who they should tell about unwanted touching, and he said they should tell an adult they trusted. Afterwards, Y.G. approached and asked to speak to a female police officer who had visited the school earlier. Negrete asked if he could help because the officer had not been at the school for some time, and Y.G. told him that "she had received unwanted touches" by someone she called Gonzalo who lived at her aunt's house. She said the touching occurred when she stayed overnight at her cousins' home, that it had happened repeatedly, and that "it had been a while since the last time that it had happened, a few months." Y.G. told Negrete that she had been touched on her "private parts" and chest. Negrete said that Y.G. was initially calm, but became upset and started crying as she described what had happened. She said she had not told her parents because she was afraid of what they would do. Mr. Negrete then called Child Protective Services ("CPS") and reported the alleged abuse.

Cyndi Cantu, interviewer at the Children's Advocacy Center, testified that she interviewed Y.G. at the request of a police officer who had a "very vague" report and needed more details. Cantu was selected to conduct the interview because she is bilingual. Cantu spoke to Y.G. at school in late November and then took a videotaped statement from Y.G. about ten days later. Cantu testified that when she first spoke with Y.G at her school, Y.G. said that in 1998, while she

lived with Perez, she had been touched on her chest and vagina and that it had happened more than once. Cantu then stopped the school interview and made arrangements for the videotaped interview. In the videotaped interview ten days later, Y.G. gave further details, telling Cantu that appellant had once touched her vagina in 1998 while she was in bed in her cousin's room and that another time he tried to touch her breasts, but she stopped him.

Detective Scott Ogle testified that Y.G. gave a general description of her abuser, saying he was "skinny, speaks only Spanish, and works as a carpet layer," and that he "had short hair, was about 28 to 30 years old, tall, black eyes, light complexion." Ogle then showed Y.G. a photograph of appellant, and she identified him as the man who had touched her. The photograph was presented by itself, not as part of a photographic lineup, and it shows a Hispanic man with a mustache and hair to his shoulders. The copy shown to Y.G. apparently had appellant's name typed on it. Ogle said the photograph represented appellant's appearance except that when Ogle saw him, appellant had shorter hair. On cross-examination, Ogle said that he would not describe appellant as overweight in the photograph, but nor could he describe him as "skinny." Ogle also said appellant was light-complected and had long hair in the photograph and agreed that appellant's name appeared somewhat prominently on the photograph, but he did not think Y.G. read it from the distance she saw the photograph. He said, "You have to understand she lived with the man for several months." Asked what information he relied on in deciding to seek an arrest warrant in this case, he answered that he mostly relied on Y.G.'s unwavering testimony. Ogle testified that the "basic information" Y.G. gave about her abuser's description matched Ogle's observations of appellant, and he said, "With a photograph being confirmed, there was no doubt in my mind."

4

Santiago Hernandez testified that he knew Reyna Perez and lived at her house for about three years, after moving into the house in late 2000. Y.G. no longer lived there but sometimes stayed overnight. A man nicknamed "Mona" also lived there briefly, and Hernandez described Mona as slender or skinny, "[t]all, kind of light-skinned," with curly hair. Hernandez worked with Perez's husband laying carpets and said that both Mona and appellant worked with them at different times. Hernandez witnessed a dispute between Mona and Reyna over Y.G. and said that Perez kicked Mona out of the house after the dispute.

Reyna Perez, Y.G.'s aunt, testified that appellant lived in her house for about five years, including the approximately two months that Y.G. lived with her, and that she helped raise appellant's daughter K. She testified that several men lived in the house on and off through the years, but she could not recall exactly when they lived there or moved out. Perez testified that she confronted appellant with Y.G.'s allegations when she learned of them in May 2001, and that appellant was shocked but agreed to leave the house as requested. Sometime after May 2001, appellant and Y.G. were at the same party, and Perez did not notice any unusual behavior by either one. Perez said that the photograph shown to Y.G. represented appellant's appearance and said "[h]e has never been skinny." She testified that Mona was tall and thin and said she thought he had short hair. She could not recall when she made Mona leave the house, and asked whether the reasons for asking him to leave were "very serious," answered, "Well, yeah, somewhat."

Dr. Beth Nauert, a pediatrician in Austin with specialized training in child abuse, examined Y.G. in September 2002 after a referral by the Austin Police Department. Nauert testified that Y.G. told her she was touched by "a man named Gonzalo" when she was about eight years' old and that she knew Gonzalo because her aunt took care of his daughter. Y.G. told Nauert that

5

Gonzalo touched her breasts and between her legs and inside her vagina, and said that it stopped when she moved out of her aunt's house. Nauert said that the results of Y.G.'s physical examination showed a small cleft in Y.G.'s hymen, which was "consistent with her history of previous vagina penetration but were not proof of it." Nauert explained that the majority of girls who are the victims of penetrating sexual assault "are going to have a normal exam by the time they get to the doctor." She said therefore that "seeing the cleft gets my attention," but did not lead her to say with "reasonable medical certainty" that Y.G. had been abused. She summarized her conclusions by stating, "I would call this exam abnormal. It is consistent with this child's history of having something put into her vaginal area, but it is not proof by itself that this happened."

Dr. William Carter testified about delayed outcries in sexual abuse cases and said that in a majority of such cases, outcries are delayed by "days, weeks, months, even years" and that in a number of cases, outcries are never made at all. Carter testified that a child might make an outcry to a teacher after a sexual education program because it would be "an opportunity presenting itself and then a child taking advantage of that opportunity." He did not believe that a false outcry would be likely in that kind of situation. In evaluating the truth of an outcry, Carter considers the child's personality, "their capacity to keep the story together, their consistency," and "how their words and their behavior and their emotions match up." Carter testified that he would not necessarily be concerned if in an initial outcry a child said that she had been touched in "her private part area and on her chest area," and then later was more specific and said that her vagina was actually penetrated. Carter said that he would be looking to see if the child's reports "basically match up."

Appellant called Dr. Charles Weaver to testify about the reliability of children's memories. Weaver testified that memory fades and becomes more unreliable as time passes and said

that a person shown a single-photo lineup may "reconstruct" her memory to fit that photograph, resulting in a false memory that is "very difficult to shake." He agreed that a "precise example of source confusion" would be if "a person remembers someone . . . skinny, short hair, light complected, mustache, and gives an accurate identification to someone else. But then you show them a picture of someone else entirely that is heavy, heavyset, got long hair. Is it possible now they are going to transpose the memory of this with their original perception of the event?" Weaver also testified about "memory hardening," meaning the process by which a memory gels and becomes consistent as a story is repeated, and said that witnesses will become more confident in their memories as they are questioned repeatedly, even if those memories are false. Finally, Weaver testified about how suggestible children can be and how easily their statements can be manipulated or changed, even accidentally. Weaver said that in the videotape of Y.G.'s interview with Cantu, he saw instances where Y.G. appeared to change her testimony in response to Cantu's questions.

**Evidentiary Rulings**

In his first, second, and fifth points of error, appellant argues that the trial court erred in allowing the testimony of Negrete, Cantu, and Nauert. He asserts that Negrete should not have been allowed to testify as an outcry witness because Y.G.'s statement to him was too vague. He asserts that Cantu should not have been allowed to testify because the trial court had already allowed Negrete as the outcry witness and, thus, Cantu's testimony was impermissible cumulative testimony. He argues that Nauert's testimony was not helpful to the jury because she testified only that Y.G.'s examination was consistent with the alleged abuse but did not establish whether abuse occurred.

7

In determining whether a witness may testify as an outcry witness or in making other evidentiary decisions, a "trial court's findings will be upheld when they are supported by the evidence, and a trial court has broad discretion in determining the admissibility of such evidence. The exercise of that discretion will not be disturbed unless a clear abuse of that discretion is established by the record." *Garcia v. State*, 792 S.W.2d 88, 92 (Tex. Crim. App. 1990); *see Hernandez v. State*, 973 S.W.2d 787, 789 (Tex. App.—Austin 1998, pet. ref'd) ("As with other decisions regarding the admissibility of evidence, we will not reverse the trial court's admission of the testimony from the second outcry witness absent an abuse of discretion.").

## 1. Outcry witnesses

We will first examine whether Negrete was a proper outcry witness and then will determine whether Cantu's testimony was properly admitted over appellant's objection.

A witness may testify as to a child's hearsay statement if that witness was the first adult to whom the abused child made a statement about the abuse. Tex. Code Crim. Proc. Ann. art. 38.072, § 2(a) (West 2005). Such testimony is allowed if the trial court determines the statement is reliable and the child testifies or is available to testify. *Id.*, § 2(b). Texas courts construe the statute to apply to the first adult to whom the child "makes a statement that in some discernible manner describes the alleged offense," and the "statement must be more than words which give a general allusion that something in the area of child abuse was going on." *Garcia*, 792 S.W.2d at 91; *see Jones v. State*, 92 S.W.3d 619, 621 (Tex. App.—Austin 2002, no pet.). Although children often do not speak in exact or precise terms, if the child sufficiently communicates that she was touched on a part of the body within the statutory definition, the statement may be admissible. *See Villalon v.*

8

*State*, 791 S.W.2d 130, 134 (Tex. Crim. App. 1990) ("we cannot expect the child victims of violent crimes to testify with the same clarity and ability as is expected of mature and capable adults"); *Gallegos v. State*, 918 S.W.2d 50, 54 (Tex. App.—Corpus Christi 1996, pet. ref'd) ("Where the child has sufficiently communicated that the touching occurred to a part of the body within the definition of the statute, the evidence will be sufficient to support a conviction regardless of the unsophisticated language that the child uses.").

Appellant contends that Y.G.'s statement to Negrete was too vague to be considered an outcry. Y.G. told Negrete that "Gonzalo," a man who lived at her aunt's house, had repeatedly touched her on her "private parts" and chest. Y.G.'s statement, although not rife with details such as date, time, or anatomical names, clearly communicated that someone named Gonzalo had touched her against her wishes and on areas of her body "within the definition of the statute," amounting to criminal conduct. *See Gallegos*, 918 S.W.2d at 54; *see also* Tex. Pen. Code Ann. §§ 21.11, 22.021 (elements of offenses). The trial court did not abuse its discretion in allowing Negrete to testify as an outcry witness under article 38.072. We overrule appellant's first point of error.

Appellant next argues that Cantu should not have been allowed to testify because the trial court had already allowed Negrete to testify as an outcry witness.

Y.G. testified first, and during his cross-examination of her, appellant repeatedly referred to her videotaped session with Cantu, asking about what he implied were inconsistencies between her trial testimony and her taped statement and inconsistencies in the taped statement itself. When the State called Cantu as a witness, appellant objected, arguing that the State could only use one outcry witness. The State countered that it was not proffering Cantu as an outcry witness but instead to answer appellant's issues related to the interview. The trial court allowed Cantu to testify,

9

and the State limited its questions of her to her educational and professional background, the arrangements for the interview with Y.G., and her demeanor during the interview. On cross-examination, appellant asked numerous questions related to leading questions and the effect such questions can have on the testimony of children and referred to the videotaped interview, which had not been introduced into evidence, asking about portions when Y.G.'s answers differed. Appellant particularly emphasized Cantu's questions regarding whether Y.G. was wearing panties under her shorts on the night appellant came into her room. For example, appellant asked Cantu, "Either she at some point said she had panties or you at some point told her, You had panties under your shorts; and then that's when she started saying she had panties under her shorts. Do you recall that?" Appellant also asked Cantu about her use of anatomically correct dolls with Y.G., asking about her knowledge of certain bans on the use of such dolls as inherently suggestive. On re-direct, the State sought to ask Cantu more questions about her interview with Y.G., arguing that appellant had opened the door to those questions by his implied charge of improper influence and improper questioning techniques. The trial court overruled appellant's objection and allowed the State to inquire as to Cantu's interview with Y.G. and Y.G.'s answers.

Rule 801(e)(1)(B) provides that one witness's testimony as to another witness's prior statement is not hearsay if the declarant testifies and the statement is consistent with the declarant's testimony and is offered to rebut a charge of recent fabrication or improper influence or motive. Tex. R. Evid. 801(e)(1)(B). Here, appellant called the credibility or reliability of Y.G.'s allegations into question from the very beginning, impliedly charging that Y.G. had been led into making her allegations of abuse and identifying appellant as her abuser by improper questioning and techniques. When Cantu was called to testify, appellant again implied that Cantu had improperly led Y.G. into

alleging sexual assault through leading questions, making false statements of fact that were then adopted by Y.G., and using anatomically correct dolls. The trial court could reasonably have found that Cantu's testimony as to questions she asked and how Y.G. answered was necessary to counter appellant's implied charge of improper influence under rule 801(e)(1)(B).[2] The trial court did not abuse its discretion in allowing Cantu to testify. We overrule appellant's second point of error.

## 2. Medical testimony

Appellant asserts that Nauert's testimony was not helpful to the jury and should not have been allowed because she testified only that Y.G.'s examination was consistent with the alleged abuse but could not testify that the examination established that the abuse actually took place.[3]

Evidence is relevant if it has any tendency to make a fact more or less probable. Tex. R. Evid. 401. Relevant evidence may still be excluded if its probative value is substantially outweighed by the danger of unfair prejudice or confusion. Tex. R. Evid. 403. A medical or other expert may give expert testimony if the evidence will assist the jury in understanding the evidence or determining a fact question. Tex. R. Evid. 702.

---

[2] We further note that appellant did not object at other points in the trial when witnesses, including Y.G. and Ogle, testified about what Cantu asked and Y.G. said during her taped interview.

[3] On appeal, appellant argues that Nauert's testimony was of no assistance to the jury and was prejudicial, referencing rules 403 and 702. *See* Tex. R. Evid. 403, 702. Before the trial court, appellant argued at great length that Nauert's testimony was prejudicial and irrelevant but did not reference rule 702, at most asking at one point how the testimony would assist the jury. The trial court overruled appellant's objection, holding the evidence was relevant and probative. *See* Tex. R. Evid. 401, 403. Appellant's trial objection clearly focused on rules 401 and 403 and did not bring any other objections to the court's attention. Therefore, appellant waived any objection beyond those based on rules 401 and 403. Tex. R. App. P. 33.1. Even if we consider appellant's argument as a rule 702 argument, however, the trial court did not err in allowing the testimony.

Nauert testified that the findings of her physical exam, which showed a small abnormality in Y.G.'s hymen, were consistent with the allegations of abuse. However, she also testified that frequently in cases where a child was sexually abused in the past, there is no physical sign of abuse. Nauert could not say that the exam results conclusively proved that Y.G. had been abused, but nor did the exam rule out or cast doubt on the allegations of abuse. This testimony is relevant to the issue of whether Y.G. was abused because it helped explain why the results of Y.G.'s examination were indefinite and why sexual abuse may not be apparent in examinations in general. We cannot hold that the trial court abused its discretion in determining that this testimony would aid the jury and therefore was relevant and admissible. Nor can we hold that the trial court abused its discretion in determining that Nauert's testimony was not overly prejudicial. Nauert testified that the results of the examination, although not counter to the allegations, did not prove that any abuse occurred at all. Further, since appellant's main defensive theory was that the wrong man was identified, testimony that was mostly neutral or slightly supportive of whether Y.G. was abused did not harm his defense. We overrule appellant's fifth point of error.

**Motion for Mistrial**

In his fourth point of error, appellant argues that the trial court erred when it denied his motion for mistrial made after Ogle stated he believed Y.G. was telling the truth.

Ogle testified that he mostly relied on Y.G.'s unwavering testimony in deciding to seek a warrant for appellant's arrest. He said, "I have had several hundred child abuse cases assigned to me, and there was no doubt in my mind that she was telling the truth." Appellant objected to that statement, and the trial court sustained the objection. Appellant moved for an instruction to

disregard, which the trial court granted, but the court denied appellant's subsequent motion for a mistrial. On cross-examination, appellant asked Ogle, "[V]ery clearly you said that this child's testimony was unwavering; is that correct?" Ogle answered, "In my opinion she was telling the truth." Appellant objected but did not obtain a ruling from the trial court and then said, "[W]e already know you said she was telling the truth. You said that she was unwavering. Does that mean that you believe that she was completely consistent?" Ogle answered, "Yes, for a victim, I do."

A trial court's denial of a motion of mistrial is reviewed for an abuse of discretion. *Trevino v. State*, 991 S.W.2d 849, 851 (Tex. Crim. App. 1999). "Generally, any error in asking an improper question is cured and rendered harmless by an instruction to disregard," and a defendant complaining of an improper question or answer must show obvious harm that could not be cured by an instruction to disregard. *McIntosh v. State*, 855 S.W.2d 753, 770 (Tex. App.—Dallas 1993, pet. ref'd) (citing *Ransom v. State*, 789 S.W.2d 572, 585 (Tex. Crim. App. 1989)). Here, the trial court gave an instruction to disregard as requested by appellant, and appellant has not shown obvious and incurable harm. Further, appellant waived any error by his own questioning that led Ogle to answer again that he believed Y.G. was telling the truth. Appellant objected, but did not obtain a ruling, and then went on to ask, "[W]e already know you said she was telling the truth. You said that she was unwavering. Does that mean that you believe that she was completely consistent?" Appellant not only brought the subject up again on cross-examination, he failed to get a ruling when he objected to Ogle's statement and then he repeated himself that Ogle believed Y.G. was telling the truth. Appellant has therefore waived any error in refusing to grant his motion for a mistrial. *See Massey v. State*, 933 S.W.2d 141, 149 (Tex. Crim. App. 1996); *Maynard v. State*, 685 S.W.2d 60, 65 (Tex.

Crim. App. 1985); *Hyde v. State*, 970 S.W.2d 81, 85 (Tex. App.—Austin 1998, pet. ref'd). We overrule appellant's fourth point of error.

## Photographic Lineup

In his sixth point of error, appellant argues that Ogle's testimony about Y.G.'s identification violated his constitutional rights and that Ogle's investigation was "so selective, one-sided and improper" that it violated his constitutional rights.[4] Appellant argues that the photographic lineup was erroneous because: his name was written on the front; it did not resemble the physical description given by Y.G. before she saw the photo; it was shown to Y.G. by itself, rather than as part of a multi-photograph lineup; and it did not include a photograph of Mona, who appellant asserts had the means and opportunity to commit the offense and more closely matched Y.G.'s physical description. Appellant admits that he did not object to the admission of the photograph or any of the identification testimony, but argues that the evidence is so "manifestly dangerously suggestive" that its admission was fundamental and reversible error.

Single-photograph lineups are improperly suggestive, but not necessarily inadmissable. *See Johnigan v. State*, 69 S.W.3d 749, 752 (Tex. App.—Tyler 2002, pet. ref'd) (citing *Manson v. Brathwaite*, 432 U.S. 98, 109 & 117 (1977)); *see also Delk v. State*, 855 S.W.2d 700, 706 (Tex. Crim. App. 1993) ( finding photograph impermissibly suggestive: "Mrs. Allen was only shown

---

[4] In his brief, appellant does not assert that the trial court erred in the admission of evidence related to Y.G.'s identification of him based on the photographic lineup, but instead attacks the trial court's decision to admit the photograph used by Ogle to obtain Y.G.'s identification. Having carefully read the substance of his argument, we will evaluate whether the evidence related to his identification was erroneously admitted.

one picture. It was presented to her as the person who was in custody, under indictment, for the murder of her husband. It is possible that this procedure suggested to Mrs. Allen that the Sheriff believed appellant was the person who killed her husband."); *Hicks v. State*, 901 S.W.2d 614, 619 (Tex. App.—San Antonio 1995, pet. ref'd) (citing *Herrera v. State*, 682 S.W.2d 313, 318-19 (Tex. Crim. App. 1984)) ("Even the use of a single photograph, while suggestive, is not necessarily inadmissible, per se."). If a photographic display was impermissibly suggestive, we must determine whether, based on the totality of the circumstances, the suggestive display gave rise to a "very substantial likelihood of irreparable misidentification." *Delk*, 855 S.W.2d at 706. A conviction "based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384 (1968). The core issue is whether under the totality of the circumstances, "the identification was reliable even though the confrontation procedure was suggestive," considering: (1) the witness's opportunity to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior descriptions; (4) the level of certainty demonstrated by the witness; and (5) the length of time between the crime and the identification. *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972). We must consider the above factors deferentially and in a light favorable to the trial court's ruling. *Loserth v. State*, 963 S.W.2d 770, 773 (Tex. Crim. App. 1998). The factors, all issues of historical fact, are weighed *de novo* against the suggestive pretrial identification procedure. *Id*. at 773-74.

In this case, Y.G. gave a physical description, which was rather vague, and also consistently said her abuser was named "Gonzalo," was a friend of her father's, worked laying carpet, lived at Y.G.'s aunt's house at the same time Y.G. lived there, and had a daughter named K. Y.G. had more than adequate opportunity to observe and even become acquainted with her assailant before the abuse occurred. The abuse occurred more than once, and although the first instance took place at night when Y.G. may have been half-asleep, her testimony does not demonstrate that she was unaware of what was going on or who the person was. Other witnesses said appellant was not what they would consider "skinny," but the photograph of appellant's face does not show him to be overweight. In the photograph, appellant has hair to his shoulders, but Ogle said appellant's hair was shorter when he saw him. We have no photographs or descriptions of appellant other than those described above. Appellant may not have fit Y.G.'s verbal description as well as Mona, but other than the length of hair, the photograph of appellant does not affirmatively conflict with the verbal description. At trial, Y.G. again identified appellant as the person who had touched her.[5] Based on this record and viewed in the light most favorable to the trial court's decision, we cannot hold that the single-photo lineup gave rise to a "very substantial likelihood of irreparable misidentification." *See Simmons*, 390 U.S. at 384; *Delk*, 855 S.W.2d at 706. We overrule appellant's sixth point of error.

---

[5] As for appellant's assertion that the admission of the photograph itself was error, the fact that the photograph had appellant's name written on the bottom would seem to bolster appellant's defense that Y.G. was led into misidentifying him rather than Mona or some other man by improper questioning techniques. Showing the jury that Y.G. saw only one photograph, which had his name written on it and which may not match Y.G.'s description as well as others might, would seem to benefit appellant in his defense. Appellant has not shown that the jury's being allowed to see the photograph amounted to fundamental error requiring reversal.

## Evidence of Mistaken Identity

In his seventh point of error, appellant argues that the trial court erred in refusing to allow him to present evidence of mistaken identity by barring Perez from testifying about Mona's alleged attempt to get one of her sons to touch his penis.[6]

Outside the presence of the jury, Perez testified that one of her young sons told her that Mona tried to get her older son to put his hand on Mona's penis and that that was the reason Perez kicked Mona out of the house. She could not recall if Mona lived in the house at the same time as Y.G., but said it had been "more or less more than two years ago" and after appellant moved out in about 2001.[7] The State objected that the evidence was hearsay and irrelevant, and the trial court sustained the objection, refusing to allow Perez to testify about the incident involving the little boy. The court limited her to testifying that she kicked Mona out for "serious" reasons and allowed appellant to question her about Mona's appearance and other issues.

Perez did not witness the alleged incident between Mona and her son, and her testimony about that incident would have been hearsay. *See* Tex. R. Evid. 801(d) (defining hearsay). Appellant does not argue that the testimony fits into any of the exceptions under which hearsay is allowable.[8] *See* Tex. R. Evid. 803. The trial court could reasonably have determined that this

---

[6] In this point of error, appellant asserts that the trial court erred in refusing to allow certain "mistaken identity" evidence by Perez, but his argument goes on to assert that the evidence is factually insufficient to support the verdict. In our discussion of this point of error we will consider only whether the trial court erred in limiting Perez's testimony and we will weigh both the legal and factual sufficiency of the evidence in our later sufficiency discussion.

[7] Trial was held in September 2003.

[8] Appellant argued at trial that the evidence should be admissible as an excited utterance, *see* Tex. R. Evid. 803(2), but he does not make this argument on appeal, nor does he argue that the

hearsay testimony was about an incident not sufficiently similar to the abuse alleged by Y.G. because although both incidents involved adults sexually abusing or attempting to sexually abuse a child, the victims were of different sexes and the abusive behavior was different. Furthermore, appellant, not Mona, lived at Perez's house while Y.G. lived there—Mona lived there for a month or two in about 2001, well after Y.G. had left and after the alleged abuse occurred. The trial court allowed extensive testimony about how Mona more closely resembled Y.G.'s description of someone skinny and with short hair. Further, the trial court allowed testimony that Mona was kicked out by Perez due to a problem related to Y.G. Arguably, that testimony would be more persuasive as "mistaken identity" evidence than testimony clarifying that Perez kicked Mona out after an incident involving her sons, not related to Y.G. We cannot hold that the trial court abused its discretion in limiting Perez's testimony. We overrule appellant's seventh point of error.

## Sufficiency of the Evidence

In appellant's third point of error, he argues that the evidence is legally insufficient because the indictments alleged that the offenses occurred on or about November 20, 2001, and November 20, 2002, but the evidence showed that the offenses occurred in 1998. We will also consider the factual sufficiency of the evidence in answer to appellant's argument related to his seventh point of error. We turn first to appellant's legal sufficiency argument.

The court of criminal appeals has held that the State is not required to allege a specific date in an indictment and that the use of the phrase "on or about" in an indictment allows the State

---

evidence falls into another exception to the hearsay rule under rule 803 or is not hearsay under rule 801(e). *See* Tex. R. Evid. 801(e), 803.

18

to prove a date other than the one alleged as long as it is before the presentation of the indictment and within the statute of limitations. *Sledge v. State*, 953 S.W.2d 253, 255-56 (Tex. Crim. App. 1997); *Mireles v. State*, 901 S.W.2d 458, 459 (Tex. Crim. App. 1995). "Where an indictment alleges that some relevant event transpired 'on or about' a particular date, the accused is put on notice to prepare for proof that the event happened at any time within the statutory period of limitations." *Thomas v. State*, 753 S.W.2d 688, 693 (Tex. Crim. App. 1988).

The indictment was presented on December 19, 2002, and appellant was indicted for aggravated sexual assault of a child and indecency with a child by contact, alleged to have been committed on or about November 20, 2001, and November 20, 2002, respectively. The statute of limitations on sexual assault of a child or indecency with a child is ten years from the victim's 18th birthday. Tex. Code Crim. Proc. art. 12.01(5) (West 2005). The jury charge stated that "the State is not required to prove the exact date alleged in the indictment but may prove the offenses, if any, to have been committed at any time prior to the presentment of the indictment so long as said offenses, if any, occurred within 10 years of the presentment of the indictment." The evidence shows that the abuse probably occurred sometime in 1998 and ended no later than Spring of 2001, when Y.G. made her outcry and appellant was asked to leave Perez's house. Thus, the offense occurred before the indictment was presented and within the limitation period.

Although appellant acknowledges that the State need not show that the offense occurred on exactly the date alleged in the indictment, he argues that "it is incomprehensible that the [S]tate can allege a certain date that deviates from the actual event by a number of years!" However, such is the state of the law, and the evidence and indictment in this case do not violate the law as set out by the court of criminal appeals. *See Sledge*, 953 S.W.2d at 256 (offenses occurred in 1986 and

19

1987, indictment presented in December 1989, alleging offense in August 1988; held that conviction was proper because offenses occurred before presentment and within statute of limitations); *see also Mendoza v. State*, No. 03-03-00162-CR, 2005 Tex. App. LEXIS 556, at *3, *8 (Tex. App.—Austin Jan. 27, 2005, pet. ref'd) (not designated for publication) (offense committed sometime between 1995 and 1999, indictment alleged offense committed on January 15, 1999; evidence held to be legally sufficient); *Owens v. State*, 96 S.W.3d 668, 671 (Tex. App.—Austin 2003, no pet.) (continuing abuse occurred from 1996 until May 1999, indictment alleged May 15, 1999 as date of offense). The dates alleged in the indictment do not render the evidence legally insufficient. We overrule appellant's third point of error and turn to whether the evidence is factually sufficient to support the verdicts.

In reviewing the factual sufficiency of the evidence, we view all of the evidence in a neutral light and will set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Clewis v. State*, 922 S.W.2d 126, 129 (Tex. Crim. App. 1996); *Winkley v. State*, 123 S.W.3d 707, 711 (Tex. App.—Austin 2003, no pet.). We will exercise our fact jurisdiction "only to prevent a manifestly unjust result." *Winkley*, 123 S.W.3d at 711 (citing *Clewis*, 922 S.W.2d at 135). It is for the finder of fact to resolve evidentiary conflicts, evaluate witness credibility, and determine the weight to be given the evidence. *Id*. "Any inconsistencies in the evidence should be resolved in favor of the verdict." *Id*. (citing *Moreno v. State*, 755 S.W.2d 866, 867 (Tex. Crim. App. 1988)).

Y.G. testified that Gonzalo, whom she identified at trial as appellant, came into the room she shared with her cousins one night and touched her vagina and later touched or attempted to touch her chest. She identified her assailant by name, stating he was a friend of her father's who

20

lived in Perez's house and laid carpet and had a daughter named K. Negrete's, Cantu's, and Nauert's testimony about Y.G.'s statements to them was consistent with Y.G.'s trial testimony. Medical evidence did not prove assault had occurred, but neither did it disprove an assault. Although there was testimony that Mona was thinner than appellant, the evidence does not show that Y.G.'s description of her abuser as tall, skinny, and with short hair could not also apply to appellant. Although appellant attempted to raise questions as to the credibility of Y.G.'s testimony by emphasizing inconsistencies in her statements and attempted to establish a defense of mistaken identity, the contrary evidence is not so strong as to outweigh the evidence supporting the jury's verdict. *See id*. We hold that the evidence is factually sufficient to support the convictions.

## Conclusion

We have considered and overruled all seven of appellant's points of errors. We affirm the judgments of conviction.

_____

David Puryear, Justice

Before Chief Justice Law, Justices B. A. Smith and Puryear

Affirmed

Filed:   September 23, 2005

Do Not Publish

21